[Civ. No. 15246. Fourth Dist., Div. Two. Dec. 23, 1975.]

ALTON H. SAXER, Plaintiff and Appellant.
PHILIP MORRIS, INCORPORATED, et al.,
Defendants and Respondents.

---

## COUNSEL

Hafif & Shernoff and Alton H. Saxer for Plaintiff and Appellant.

McKenna & Fitting, Aaron M. Peck, Michael D. Berk and Michael R. Grzanka for Defendants and Respondents.

---

## OPINION

**THE COURT.**\*—Mission Viejo is a big, modern, fast-growing, multi-million dollar complex in Orange County being developed by the

---

*Before Tamura, Acting P. J., Kaufman, J. and McDaniel, J.

Mission Viejo Company. It presently consists of 4,000 homes and nearly 20,000 people. When a person decides to buy a home, the sales force presents him with an attractive, complete package: financing is provided by M.V.C. Financial Corporation; title services and title policies are handled by M.V.C. Escrow Corporation; the standard carpeting installed in the new homes is furnished by the Mission Viejo Decorating Center; if the buyer wants a higher grade of carpeting, he may have the same installed and receive a credit for the value of the standard floor coverings, provided he purchases it from the Decorating Center.

Mission Viejo Company owns and controls the M.V.C. Escrow Corporation, the M.V.C. Financial Corporation and the Mission Viejo Decorating Center. In turn, Philip Morris, Inc. owns and controls Mission Viejo Company.

Alton H. Saxer purchased a home in Mission Viejo and subsequently filed a class action to recover damages under the Cartwright Act upon behalf of himself and the other homeowners ("Plaintiff" and "Appellant") against Philip Morris, Inc., Mission Viejo Company, M.V.C. Financial Corporation and M.V.C. Escrow Corporation ("Defendants" and "Respondents"). Demurrers were sustained and leave granted to amend the original, the first, second and third amended complaints. Following the filing of the fourth amended complaint, demurrers were sustained without leave to amend.

Saxer appeals on the basis that the three counts contained in the fourth amended complaint properly charge an unlawful combination in restraint of trade against all of the defendants.

We have determined that Saxer has stated a case against each corporate defendant and reverse the judgment of dismissal.

## FACTS

Soon after its formation, the Mission Viejo Company ("Company") became a major developer and seller of new residential real estate in Orange County; in fact, it rapidly became one of the largest real estate development-sales firms in the county. The development consists of 11,000 acres, 4,000 homes, and 17,000 residents. For all practical purposes, it is a city, with all the business, commercial and cultural enterprises necessary to service a metropolitan area.

In May 1969, Philip Morris commenced negotiations to acquire the Company. In January 1970, it consummated a series of agreements whereby it acquired (through a convertible note and option agreements) the right to purchase the capital stock of the firm and the right to select the majority of directors.

After acquiring voting control, the Company's board of directors was increased from 9 to 12 members and the 7 existing vacancies were filled by Philip Morris' own officials. In September 1972, Philip Morris acquired all of the remaining stock in Company.

In March 1970, M.V.C. Escrow Corporation was formed and ownership and control was assumed by the Company.

In May 1970, M.V.C. Financial Corporation, a corporation subject to control through the Company's directors, sought to qualify as an approved Veterans Administration lender. (It had been previously authorized to make F.H.A. loans.) In November 1971, Financial Corp. began making F.H.A. and V.A. loans.

All newly built homes were furnished with standard floor coverings installed by the Company's Mission Viejo Decorating Center. However, in the event a homebuyer wanted a higher quality of floor covering ("upgraded floor covering") installed before the close of escrow, he had the right to select a better carpeting at a higher price; inasmuch as the standard floor coverings were included in the base price of the home, the Decorating Center would give him a credit for the standard floor coverings and deduct the same from the purchase price of the upgraded carpeting desired, providing the better carpeting was purchased exclusively from the Decorating Center.

In early 1972, Saxer purchased a new home built by the Company. The escrow was handled by Escrow Corp. The F.H.A. insured loan was provided by Financial Corp. at an 8 percent annual percentage rate (A.P.R.). Saxer selected a nonstandard grade of carpeting and it was installed by the Decorating Center prior to the close of escrow.

At the time Saxer purchased his home, Philip Morris, by virtue of its stock ownership and control of the Company and, in turn, through the Company's ownership and control of Financial Corp., Escrow Corp., and its ownership of the Decorating Center, was in a position to supply an exclusive "package deal" in connection with the sale of all homes within

the Mission Viejo community, to wit, the land and improvements, the escrow service, the F.H.A. and V.A. financing, and the installation of the upgraded carpeting.

*First Cause of Action*

The fourth amended complaint contains the customary jurisdiction and venue allegations: each of the corporate defendants is a California corporation, or is headquartered in Orange County, or is doing substantial business within Orange County, and has agents and employees therein.

It sets out the class action allegations: Saxer purchased a home in Mission Viejo from the Company; obtained an F.H.A. insured loan from Financial Corp.; utilized the escrow services of Escrow Corp.; and purchased upgraded floor coverings from the Decorating Center; the action is filed on behalf of all homeowners who purchased homes in the community of Mission Viejo during the four years immediately preceding the filing of the complaint and who have paid for escrow services provided by Escrow Corp.; have obtained F.H.A. or V.A. financing through Financial Corp.; have paid for upgraded (nonstandard) floor coverings which were purchased from the Decorating Center prior to the close of escrow; that joinder of all parties-plaintiff would be impracticable; that there are common questions of law and fact, with the principal questions all relating to the application of the Cartwright Act to the purchase of real property, escrow services, financing and nonstandard floor coverings by the plaintiff and members of the class from the defendants; that the common questions of law and fact predominate over any affecting individual members only; and that Saxer is a typical member of the class and can fairly represent the members thereof.

After pleading the jurisdictional, venue and class action essentials, plaintiff reached the heart of the lawsuit: Philip Morris, after acquiring control of the Company, Financial Corp. and Escrow Corp., entered into a conspiracy with its newly acquired subsidiaries to restrain trade in the sale of escrow services required by purchasers of Company-built houses and to increase the price of such escrow services; the conspiratorial agreement to monopolize the escrow business and to charge higher prices than could be obtained at other reputable escrow firms involved the following practices: Salespersons were instructed to fill in and complete deposit receipts on new home sales for the purpose of designating Escrow Corp. as the escrow agent; Escrow Corp. was to be

notified whenever a new home was sold by the Company; buyers were to be referred exclusively to Escrow Corp. for the purpose of opening escrows; and a corporate decision was made that no independent escrow company would be permitted to either buy land or lease space for the purpose of conducting an escrow business within the community of Mission Viejo; officers of the Company and the Escrow Corp. also agreed upon a price schedule for the services to be provided by Escrow Corp., which price schedule reflected prices in excess of those charged by 25 independent escrow firms situated within a 15-mile radius of Mission Viejo; by reason of Company's regular, systemized practice of channeling the purchasers to Escrow Corp., very rarely were outside firms contacted by buyers for the purpose of providing escrow services; independent firms were willing and able to provide escrow services to Mission Viejo buyers but were directly excluded from that home market and were prevented from competing for such business by virtue of the agreement between Company and Escrow Corp. not to allow said firms to buy or lease facilities and by the Company's practice of channeling all buyers directly to Escrow Corp.; by reason of said practices, Escrow Corp. was in a position to charge higher fees; that by virtue of the unlawful combination existing between Company and Escrow Corp. and as a consequence of it, Escrow Corp. has the only escrow service in Mission Viejo and exacts higher fees than independent escrow firms in the surrounding area.

## Second Cause of Action

After Philip Morris acquired control of Mission Viejo's board and assets, the Company combined with Financial Corp. to restrain trade for two purposes: (1) To increase the price of new homes sold, enabling Company to reap a higher profit; and (2) to prevent outside lending institutions from making any F.H.A. and V.A. guaranteed loans to Mission Viejo homebuyers, thereby assuring Financial of a monopoly in lending.

Enhanced purchase prices were to be realized by the Company by a simple expedient: The first trust deed lender (Financial Corp.) merely charged the seller (Company) an excessive amount of points (loan discounts) for making the loan; the cost of the loan was passed on to the buyer in the form of a higher purchase price for the house.

To accomplish the second purpose of excluding all independent lenders, a series of agreements between the corporate defendants were

entered into for the purpose of making Financial Corp. the sole lending agency for certain tracts in Mission Viejo. These agreements to eliminate outside lenders involved employment of the following practices: (1) Instructions to salespersons and escrow employees to use Financial as sole lender; (2) price-fixing was to be accomplished by charging higher loan discounts (points); and (3) the adoption of a formula for pricing new homes in order to compensate Company for the excessive loan discount charged by Financial.

Many independent first trust deed lenders were located within a short range of the community who would have been willing to provide F.H.A. or V.A. loans at a lesser annual percentage rate of interest by simply charging a lower loan discount.

When Saxer purchased his home and entered into escrow in January 1972, the purchase was contingent upon obtaining an F.H.A. loan. Financial Corp. provided the F.H.A. loan at an annual percentage rate (A.P.R.) of 8 percent (8%) at a time when similar loans were available at 7¾ percent or less. Financial charged the Company five points for making the loan; thus accounting for the excessive annual percentage rate of 8 percent. Independent firms, if allowed to operate in Mission Viejo, would have charged the seller (Company) less points, thus accounting for the lesser A.P.R. of 7¾ percent.

*Third Cause of Action*

Commencing in March 1970, the Company and Escrow Corp. unlawfully combined for the following purposes: (1) To prevent competition and restrict trade in the sale of upgraded (nonstandard) floor coverings to buyers of newly built residences; and (2) to increase the price of upgraded coverings sold to the purchasers.

It is a common practice for Mission Viejo homebuyers to upgrade the floor coverings in their new homes; it happens 75 percent of the time. Standard carpeting is generally included in the purchase price of the house. Corporate employees were instructed to inform new homebuyers who desired a better grade of carpeting that they would receive no credit for the standard floor coverings if upgraded floor coverings were purchased from any source other than the Decorating Center. In the event a buyer wished to upgrade the standard floor coverings and did not wish to purchase from the Decorating Center, he not only would not get the credit but would not be allowed to have the desired floor coverings

installed prior to the close of escrow. All new homebuyers were directed to the Decorating Center where all upgraded carpeting was sold at a higher price than could be obtained elsewhere. Finally, all independent retail carpeting suppliers were to be excluded from Mission Viejo by simply refusing to sell or lease land to them within Mission Viejo's boundaries.

Saxer and other buyers purchased nonstandard carpeting from the Decorating Center at a price higher than they would have had to pay if it was not for the unfair competition and restraint of trade engaged in by the defendants.

*Damages*

Saxer complains that he and other homebuyers could have purchased the escrow services at lower cost elsewhere; that more favorable F.H.A. or V.A. loans at lesser interest rates were available elsewhere; and that upgraded floor coverings at a lesser cost or better floor coverings for the same price were available at other suppliers.

### CONTENTIONS AND DISPOSITION

■ The sole issue involved in a hearing on a demurrer is whether the complaint, as it stands, unconnected with extraneous material, states a cause of action. (*Griffith* v. *Department of Public Works,* 141 Cal.App.2d 376, 381 [296 P.2d 838].) In testing the legal sufficiency of a pleading against a general demurrer, all properly pleaded allegations, including those that arise by reasonable inference, are deemed admitted regardless of the possible difficulty of proof at trial. (*Universal By-Products, Inc.* v. *City of Modesto,* 43 Cal.App.3d 145, 151 [117 Cal.Rptr. 525]; see also *Alcorn* v. *Anbro Engineering, Inc.,* 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 800, pp. 2413-2414.) The allegations must be liberally construed with a view toward substantial justice between the parties. (Code Civ. Proc., § 452; *Buxbom* v. *Smith,* 23 Cal.2d 535, 542 [145 P.2d 305]; *Cameron* v. *Wernick,* 251 Cal.App.2d 890, 892 [60 Cal.Rptr. 102].)

■ ■■■ Saxer contends that the fourth amended complaint alleges sufficient facts to state three causes of action for restraint of trade in violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.).[1]

---

[1]Defendants contend that Saxer should not be allowed to act as both class representative and as one of the attorneys for the class. This contention lacks merit inasmuch as the court in *Daar* v. *Yellow Cab Co.,* 67 Cal.2d 695 [63 Cal.Rptr. 724, 433 P.2d 732], implicitly sanctioned such dual representation.

He asserts two bases for this claim: First, that the agreements among the defendants constitute a combination of capital, skill or acts to restrict trade in violation of sections 16720 and 16726; second, that such agreements are tying arrangements also violative of sections 16720 and 16726.

■ The Cartwright Act is patterned upon the federal Sherman Anti-Trust Act and both derive their basic provisions from the common law policy against restraint of trade; thus cases decided under the latter act are applicable as an aid to decision in interpreting the former. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.,* 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481]; *Widdows* v. *Koch,* 263 Cal.App.2d 228, 234 [69 Cal.Rptr. 464].)[2] ■ While the Cartwright Act is couched in terms of prohibited conduct with criminal sanctions and the Attorney General is charged with its public enforcement private enforcement is also authorized and encouraged. (*Chicago Title, supra,* 69 Cal.2d at p. 322; see also *Radovich* v. *Nat. Football League,* 352 U.S. 445, 453-454 [1 L.Ed.2d 456, 462-463; 77 S.Ct. 390, 395].)

■ A combination does not give rise to a cause of action unless a civil wrong has been committed which results in damage. Where a complaint charges conspiratorial conduct and the commission of a wrongful act, the significance of the conspiracy charge is to implicate each member participating in the common plan and thus place liability on the entity that acquiesced in the plan to commit the wrong as well as on the entity that actually perpetrated it. (*Chicago Title, supra,* 69 Cal.2d at p. 316.) The conspiracy can be inferred from the nature of the acts done, the relationship of the alleged conspirators, the interests of the parties, and the individual circumstances surrounding each case. (*Chica-*

[2]The Cartwright Act provides in part: "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes: (a) To create or carry out restrictions in trade or commerce. . . . (c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity. . . . (e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any or any combination of any of the following: . . . (4) Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected." (Bus. & Prof. Code, § 16720.)

Section 16702 of the Business and Professions Code defines "persons" as ". . . corporations, firms, partnerships and associations existing under or authorized by the laws of this State or any other State, or any foreign country."

Section 16726 of the Business and Professions Code states: "Except as provided [herein] . . . , every trust is unlawful, against public policy and void."

go *Title, supra;* see also *Jones* v. *H. F. Ahmanson & Co.,* 1 Cal.3d 93, 119 [81 Cal.Rptr. 592, 460 P.2d 464].)

In order to maintain a cause of action for a combination in restraint of trade, the complaint must allege: (1) The formation and operation of the conspiracy; (2) the illegal acts done pursuant thereto; and (3) the damage caused by such acts. (*Chicago Title, supra,* 69 Cal.2d at p. 316.)[3] General allegations of a conspiracy are sufficient if the unlawful acts are pleaded with particularity. (*Ibid,* at p. 316.) However, multifarious facts illustrative of nefarious agreements need not be alleged if the pleadings, liberally construed, are capable of an interpretation exhibiting the existence of facts constituting the combination, its object, and achievement in restraint of trade. Plaintiff has exceeded these requirements in the present case.

Numerous agreements were alleged describing the formation of the combinations. Indeed, defendants do not seriously controvert the conclusion that sufficient facts were pleaded to indicate such formation with respect to the first two causes of action. As to the cause of action dealing with the sale of upgraded floor covering, defendants argue that various instructions given by Company to Escrow Corp. concerning the handling of escrows for the sale of homes were insufficient to establish the formation of a combination. Saxer alleges, in pertinent part, that Company instructed personnel of Escrow Corp. to communicate with employees of the Decorating Center (a separate operating division of Company) to ascertain whether payment had been received on the purchase of any upgraded floor coverings; purchasers were required to obtain a written statement from the Decorating Center acknowledging receipt of payment before being allowed to close escrow; the Decorating Center was directed to furnish Escrow Corp. with duplicates of all documents relating to a homebuyer's purchase of upgraded floor coverings; whenever a new home purchase involved a loan, the Decorating Center was not to place an order until Escrow Corp. had notified it of loan approval; and that floor coverings purchased from any source other than the Decorating Center could not be installed prior to the close of escrow.

Defendants assert that these are the type of instructions which would be given to any escrow agent retained to handle the transaction and

---

[3]Saxer initially argues that section 16756 of the Business and Professions Code outlines the pleading requirements for a Cartwright Act violation in a civil action. However, this contention was considered and rejected in *Chicago Title, supra,* 69 Cal.2d at pages 317-318.

merely illustrate the business practices of Company. While we agree that such allegations evidence the business policies and practices of Company, we disagree with defendants' contention that they are merely innocuous facts not indicative of a combination. It can hardly be assumed that a separate escrow agent would have followed Company's instructions and prevented the close of escrow until the Decorating Center had received payment for upgraded floor coverings. Nor is it likely that Company could have compelled another escrow agent to ascertain whether or not payment had been received before allowing escrow to close. Nor could it have forced the purchaser to produce a "clearance" from the Decorating Center prior to the close of escrow.

Plaintiff next contends that the purposes of such combinations are adequately alleged. ■ While allegations of the purposes of the conspiracy must normally be specific, inferences as to purpose may be drawn where the effect of the combination is apparent from the face of the complaint. (*Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d 93, 119.) We need not resort to inference in the instant controversy for plaintiff has alleged an array of facts indicative of the purposes of the combinations.

■ The first cause of action alleges that Company and Escrow Corp. combined for the purpose of preventing competition and restricting trade in the sale of escrow services and for the further purpose of establishing the price of such services in excess of those charged by other firms in the surrounding area. The second cause of action alleges that Company and Financial Corp. combined for the purpose of preventing competition and restricting trade in the making of F.H.A. and V.A. loans. It also alleges that another purpose of the combination was to increase the price of new homes inasmuch as Company was charged an excessive amount of points (loan discounts) by the lender. The third count contains similar averments as to restriction of trade and excessive prices for upgraded floor coverings. Unlike the *Chicago Title* and *Ahmanson* cases, where the purpose of the combinations was either alleged in vague, general terms or not at all, the allegations herein specify the purposes with the requisite precision.

Plaintiff also contends that the claimed combinations effected an illegal restraint of trade. This, of course, is the essence of the case. For plaintiff to successfully maintain this position, facts must be alleged indicating the creation or accomplishment of restrictions on trade. (Bus. & Prof. Code, § 16720, subd. (a); *Corwin* v. *Los Angeles Newspaper*

*Service Bureau, Inc.,* 4 Cal.3d 842, 853 [94 Cal.Rptr. 785, 484 P.2d 953]; *Sherman* v. *Mertz Enterprises,* 42 Cal.App.3d 769, 776 [117 Cal.Rptr. 188].)

The first count alleges that Company organized Escrow Corp. and then unlawfully combined with it to restrain trade in the sale of escrow services; that Company's salespersons were instructed in the procedure for completing new home deposit receipts so that Escrow Corp. was designated as the escrow agent; that purchasers were specifically directed to Escrow Corp. for the purpose of opening escrows; and that independent escrow agents were prevented from purchasing land or leasing space within the Mission Viejo development for the purpose of conducting an escrow business.

The second count alleges that Company combined with Financial Corp. to prevent competition and restrain trade in the F.H.A. and V.A. loan market; that other qualified F.H.A./V.A. first trust deed lenders were prevented from competing with Financial Corp. in certain tracts or units of tracts pursuant to an agreement between Company and Financial Corp.; that Company and Financial Corp. agreed upon a formula for determining the size of the loan discount to be charged Company by Financial Corp.; and that the price of new homes within the relevant tracts was formulated so that Company would be compensated for the excessive loan discount charged by Financial Corp.

The third count alleges that Company and Escrow Corp. combined to restrain trade and prevent competition in the sale of upgraded floor coverings; that personnel of the respective companies were instructed to inform purchasers wishing to upgrade the floor coverings in their homes that not only would no credit be allowed for the standard floor coverings if upgraded products were purchased from' a supplier other than Company's Decorating Center, but also that such "outside" products could not be installed prior to the close of escrow; and that an agreement was reached whereby carpeting suppliers were precluded from either leasing space or purchasing land in Mission Viejo.

The plaintiff has also alleged that the antitrust violations were the proximate cause of his injuries. (See *Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d at p. 119; *Chicago Title, supra,* 69 Cal.2d at pp. 317-318; *Overland Pub. Co.* v. *H. S. Crocker Co.,* 193 Cal. 109, 114-115 [222 P. 812]; *Highland Supply Corp.* v. *Reynolds Metals Co.* (8th Cir. 1964) 327 F.2d 725, 732.) An extended discussion on proximate cause need not be

undertaken at this time since much of the law in this area has been developed in "standing to sue" cases which shall be discussed *infra*.

The complaint indicates that because of the alleged unlawful combinations in restraint of trade, the cost of the goods and services in question was higher than they would have been had independent firms been allowed to compete in Mission Viejo and that plaintiff thereby sustained injury. ■ The alleged antitrust violation need not be the sole or controlling cause of the injury in order to establish proximate cause, but only need be a substantial factor in bringing about the injury. (*Mulvey* v. *Samuel Goldwyn Productions* (9th Cir. 1970) 433 F.2d 1073, 1075, fn. 3, cert. den., 402 U.S. 923 [28 L.Ed.2d 662, 91 S.Ct. 1377].) It would strain credulity to hold that insufficient facts were alleged illustrative of the manner in which defendants' conduct was a substantial factor in bringing about plaintiff's injuries.

Subjecting the complaint to a liberal construction, as we must, it can hardly be concluded, as defendants urge, that such allegations are innocuous and that any restraint is, at most, *de minimis*. ■ ■■■ We cannot say, as a matter of law, that the purported restraints are not unreasonable.[4] This is a question of fact to be determined at trial. (*Corwin, supra,* 4 Cal.3d at p. 855.) If the plaintiff can prove the existence of these restraints on trade, they are violative of the Cartwright Act unless shown to be reasonable. (*Corwin, supra,* 4 Cal.3d at p. 854.) In deciding whether the restrictions are reasonable, " 'the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts.' [Citation.] The court should consider 'the percentage of business controlled, the strength of the remaining competition [and] whether the action springs from business requirements or purpose to monopolize. . . .' [Citations.]" (*Corwin, supra,* 4 Cal.3d at pp. 854-855.)

■ Plaintiff contends that the actions of defendants also constitute a tying arrangement violative of sections 16720 and 16726.

---

[4]While both section 1 of the Sherman Act and sections 16720 and 16726 of the Cartwright Act purport to prohibit all restraints on trade, each has been interpreted to permit restraints found to be reasonable. (*Standard Oil Co.* v. *United States*, 221 U.S. 1, 60 [55 L.Ed. 619, 645, 31 S.Ct. 502, 516]; *Corwin, supra,* 4 Cal.3d at p. 853.)

■ " 'For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed "tying agreements serve hardly any purpose beyond the suppression of competition." [Citation.] They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power of leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons "tying agreements fare harshly under the laws forbidding restraints of trade." [Citation.]' (Fns. omitted.) (*Northern Pac. R. Co.* v. *United States, supra,* 356 U.S. 1, 5-6 [2 L.Ed.2d 545, 550, 78 S.Ct. 514].) Tying arrangements are illegal per se 'whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product' (*Northern Pac. R. Co.* v. *United States, supra,* 356 U.S. at p. 6 [2 L.Ed.2d at p. 550]; *Fortner Enterprises* v. *U.S. Steel, supra,* 394 U.S. 495, 499, 503 [22 L.Ed.2d 495, 502, 505, 89 S.Ct. 1252]) and when 'a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis,* is foreclosed to competitors by the tie . . . .' (*Fortner Enterprises* v. *U.S. Steel, supra,* 394 U.S. at p. 501 [22 L.Ed.2d at p. 504].)" (*Corwin, supra,* 4 Cal.3d at pp. 856-857.)

Although coercion is an element which must be pleaded and proved in all tying arrangements, it is slowly being eroded in favor of a somewhat less stringent test that examines the utilization of economic power in bringing about the alleged injury. (*Corwin, supra,* 4 Cal.3d 842; *Sherman* v. *Mertz Enterprises, supra,* 42 Cal.App.3d 769.) Even under the latter test, we find no tying arrangement alleged with respect to the first and second causes of action. ■ As to the third cause of action a tying arrangement is clearly alleged. A homebuyer wishing to upgrade his floor coverings must do so before the close of escrow and must also purchase the upgraded product from Company's Decorating Center in order to receive credit for his standard floor covering.[5]

*Philip Morris*

■ Plaintiff contends that sufficient facts have been alleged to establish the participation of Philip Morris in the allegedly unlawful

[5]Defendants contend that the homes and floor coverings are a single product rather than separate items. This is a question of fact to be resolved at trial. (*Corwin, supra,* 4 Cal.3d at pp. 858-859.)

combinations. We agree. The relevant allegations are as follows: Philip Morris owns all of the stock of Company, which in turn owns all of the stock of Escrow Corp. and Financial Corp.; a majority of Company's board of directors were officers and directors of Philip Morris; Philip Morris has had complete knowledge of and has been a participant in the illegal acts perpetrated by the other defendants; Escrow Corp. came into existence after Philip Morris had obtained control of Company; the president of Company was appointed a vice-president of Philip Morris and the chairman of Company was elected to Philip Morris' board of directors after Philip Morris acquired control of Company; an upper echelon management employee of Philip Morris was named a vice-president of Company; there were numerous communications between officers of Company and officers of Philip Morris concerning the operation of Company; and a resolution was unanimously approved at a Company board of directors meeting acknowledging, in substance, that Philip Morris was aware of Company's plans and operations, supported them, and that any change in such plans could be effected only by action of the board.

In contrasting this case with *Chicago Title, supra,* which defendants contend is controlling as a matter of law, several distinctions are readily apparent. In *Chicago Title,* the plaintiffs joined a defendant, Lehman Brothers, not upon the basis of its own misconduct, but rather, upon the misconduct of corporations which were controlled by companies .in which Lehman Brothers owned a major or controlling interest. The only facts alleged as to Lehman Brothers were as follows: It was a partnership; it owned stock in Great Western and Financial; and, at times, it had two or more directors concurrently on the boards of Great Western and Financial, respectively. Therefore, Lehman Brothers could be reached only by way of factual allegations of conduct on the part of related defendants from which a conspiracy or combination with the intent to jeopardize plaintiffs' business could be inferred. An identical analysis was deemed applicable to Great Western and Financial in their passive administrative role as holding companies; Great Western S and L as a lending institution relatively remote from the scene; and even Security, which, as title insurer, simply issued the policies which formed the subject matter of plaintiffs' claims.

It can be seen that Philip Morris did not occupy a passive role relatively remote from the other defendants. Unlike *Chicago Title,* in ascending the corporate chain of command in the instant controversy only one step is required to reach Philip Morris. Indeed, defendants have

argued, albeit in another context but also applicable here, that all of them are so closely united in interest that they constitute a single business enterprise. Thus, at least an inference of knowing and willful participation by Philip Morris in the allegedly illegal conduct can be gleaned from the pleadings.

*Standing*

 Defendants contend that even if a combination has been alleged, Saxer and others similarly situated lack standing to bring this suit. In order to have standing to maintain an action for violation of the antitrust laws the plaintiff must be within the "target area" of the alleged violation—"the area which it could reasonably be foreseen would be affected" by the antitrust violation. (*Twentieth Century Fox Film Corporation* v. *Goldwyn* (9th Cir. 1964) 328 F.2d 190, 220, cert. den., 379 U.S. 880 [13 L.Ed.2d 87, 85 S.Ct. 143]; see also *Hoopes* v. *Union Oil Company of California* (9th Cir. 1967) 374 F.2d 480, 485; *Karseal Corporation* v. *Richfield Oil Corporation* (9th Cir. 1955) 221 F.2d 358, 362-365.)

Defendants argue that their potential competitors, who had been excluded from the Mission Viejo development, were the target of any policy to restrain trade. Defendants' argument, however, ignores the fact that plaintiff has sustained injury as an immediate result of their policies. Plaintiff's injuries were not "secondary" or "consequential," since they did not result from injury to third parties; they were not "remote," for they were the direct result of the allegedly illegal conduct. (*Hoopes* v. *Union Oil Company of California, supra; Conference of Studio Unions* v. *Loew's, Inc.* (9th Cir. 1951) 193 F.2d 51, 54-55, cert. den., 342 U.S. 919 [96 L.Ed. 687, 72 S.Ct. 367].) The fact that plaintiff was not a competitor of defendants presents no obstacle to recovery for "The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. [Citations.] The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." (*Mandeville Farms* v. *Sugar Co.*, 334 U.S. 219, 236 [92 L.Ed. 1328, 1340, 68 S.Ct. 996, 1006], reh. den., 334 U.S. 835 [92 L.Ed. 1761, 68 S.Ct. 1343].)

## CONCLUSION

 While the complaint may not be as artistically drawn as might be desired, it is the exception rather than the rule to discover a model

pleading in antitrust litigation. Perhaps this is the result of the very nature of the action itself. Antitrust schemes generally are conceived in secrecy and live their lives in relative obscurity. It is only when they are called to face their creator that they betray their theretofore seemingly innocuous existence. As Mr. Justice Mosk said in his dissent in *Chicago Title, supra,* 69 Cal.2d at p. 328: "This case should not be decided on the pleadings. . . . [A court should not] impose upon plaintiffs a pleading straitjacket neither compelled by precedent nor consistent with the design of antitrust statutes." To do so would hardly comport with the spirit underlying such statutes. Thus, we conclude that plaintiff is entitled to a day in court on his general theory of a conspiracy and combination in restraint of trade as to all causes of action and also upon his claim of an illegal tying arrangement as to the third cause of action. We also hold that plaintiff may proceed to trial on his complaint without the necessity of amending. (*Sherman* v. *Mertz Enterprises, supra,* 42 Cal.App.3d at p. 780.)

The judgment of dismissal is reversed.

A petition for a rehearing was denied January 13, 1976. Respondents' petition for a hearing by the Supreme Court was denied March 3, 1976. Clark, J., was of the opinion that the petition should be granted.