In re COORDINATED PRETRIAL PRO-
CEEDINGS IN PETROLEUM PROD-
UCTS ANTITRUST LITIGATION.

**MDL No. 150 WPG.**

United States District Court,
C. D. California.

July 29, 1980.

Order Aug. 26, 1980.

Robert K. Corbin, Atty. Gen., Kenneth R. Reed, Chief Counsel, Antitrust Section, Asst. Atty. Gen., David B. Goldstein, Asst. Atty. Gen., Antitrust Division, Phoenix, Ariz., for State of Arizona.

George Deukmejian, Atty. Gen. by Michael Ivan Spiegel, Wayne M. Liao, William S. Clark, Deputy Attys. Gen., Dept. of Justice, State of California, San Francisco, Cal., for State of California.

Jones & Dunne, Stephen L. Dunne, San Diego, Cal., for State of Florida.

James Kirkham Johns, Chief Counsel, Antitrust Division, Salem, Or. by Michael G. Hanlon, Asst. Atty. Gen., Antitrust Division, for State of Oregon.

Slade Gorton, Atty. Gen. by Thomas L. Boeder, Senior Asst. Atty. Gen., Jay Uchida, Asst. Atty. Gen., Consumer Protection and Antitrust Division, State of Washington, Seattle, Wash., for State of Washington.

Hughes, Hubbard & Reed, Otis Pratt Pearsall, John A. Donovan, Philip H. Curtis, New York City, and Donald A. Bright, Howard S. Fredman, Barbara A. Hindin, General Litigation Attys., Los Angeles, Cal., and Hughes, Hubbard & Reed, Ronald C. Redcay, Los Angeles, Cal., for defendant Atlantic Richfield Co.

Milbank, Tweed, Hadley & McCloy, Adlai S. Hardin, Jr., New York City, for defendant Amerada Hess Corp.

Procopio, Cory, Hargreaves & Savitch, Robert G. Russell, Jr., Paul B. Wells, San Diego, Cal., for Cities Service Company—Cities Service Oil Co.

Latham & Watkins, Fredric J. Zepp, John D. Demorest, Los Angeles, Cal., and Tom Burton, Bruce Merrill, General Attys., Houston, Tex., for Continental Oil Co.

McCutchen, Black, Verleger & Shea, Philip K. Verleger, David A. Destino, Lisa C. Woods, John C. Mueller, Los Angeles, Cal., and C. Kenneth Roberts, John Chiles, James A. Drexler, Houston, Tex., and Rosemary Stein, New York City, for defendant Exxon Corp.

Dechert, Price & Rhoads by Robert A. Cohen, New York City, and Philip J. Englund, House Counsel, Los Angeles, Cal., for defendant Getty Oil Co.

John E. Bailey, Harry P. Davis, Jr., Joan B. Oxford, George E. Jarvis, Law Dept., Houston, Tex., for defendant Gulf Oil Company–U.S.

Donovan, Leisure, Newton & Irvine by Andrew J. Kilcarr, Washington, D.C., Charles F. Rice, New York City, Vincent Tricarico, Maureen O'Bryon, Washington, D.C., and Sheppard, Mullin, Richter & Hampton by Don T. Hibner, Jr., Los Angeles, Cal., for defendant Mobil Oil Corp.

Sullivan & Cromwell, John Dickey, Richard Menaker, New York City, and Adams, Duque & Hazeltine, John H. Brinsley, Catherine H. Ruddy, Los Angeles, Cal., and Phillips Law Department, Neal Lehman, Bartlesville, Okl., for Phillips Petroleum Co.

Kadison, Pfaelzer, Woodard, Quinn & Rossi, Lawrence A. Cox, Los Angeles, Cal., for defendant Powerine Oil.

Howrey & Simon, William Simon, William O'Brien, Washington, D. C., for defendant Shell Oil Co.

Pillsbury, Madison & Sutro, Richard J. MacLaury, Robert P. Taylor, Robert A. Mittelstaedt, David C. Stegall, San Francisco Cal., for Standard Oil Company of California.

M. J. Keating, Chicago, Ill., and Paul, Hastings, Janofsky & Walker, Oliver F. Green, Jr., Los Angeles, Cal., for Standard Oil Company (Indiana).

J. King Rosendale, Cleveland, Ohio, and Payne, Hilgendorff, Morehouse & Shafer, Paul C. Shafer, Jr., Fairfield, Conn., for Standard Oil Company (Ohio).

Robert M. Dubbs, Radnor, Pa., and Pepper, Hamilton & Sheetz, John G. Harkins, Philadelphia, Pa., for Sun Oil Co.

## MEMORANDUM OF DECISION REGARDING STANDING AND ILLINOIS BRICK

WILLIAM P. GRAY, District Judge.

The states of Arizona, California, Florida, Oregon and Washington have brought actions against several major oil companies, alleging violations of federal and state antitrust laws. These cases have been consolidated in this court for pretrial proceedings. The defendants have moved to dismiss certain portions of the complaints on the grounds that the plaintiffs lack standing to sue under the antitrust laws or that the rule in *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) precludes the plaintiffs from proving certain types of damages.

The motions to dismiss are directed against two causes of action set forth in the complaints.[1] The first cause of action in each complaint accuses the defendants of conspiring to restrain or monopolize interstate commerce in "the production, transportation, and refining of crude oil and the distribution and marketing of refined [petroleum] products." The complaints allege that this was accomplished by using the existing structure of the petroleum industry, together with horizontal agreements and concerts of action in violation of sections 1 and 2 of the Sherman Act. The second cause of action asserts that the defendants combined or agreed to restrain or monopolize commerce by creating "an artificial scarcity of crude oil and refined petroleum products within the United States"

---

1. The first two causes of action alleged in the Arizona, California, Oregon and Washington complaints are nearly identical. There are minor variations in language and some additional overt acts are alleged in the California and Oregon complaints. Florida's complaint makes the same general allegations as the other states but is different in many of the overt acts alleged. In all, however, the major claims of the five complaints are quite similar and will be treated as identical for purposes of this discussion.

and in each plaintiff state. The plaintiffs complain that they, and those on whose behalf they sue, have been damaged by the price increases for refined petroleum products that resulted from the alleged antitrust violations.

## I. STANDING TO SUE FOR DAMAGES

### A. Clayton Act § 4

Each of the plaintiff states alleges that it is a purchaser or consumer of petroleum products. With the possible exception of Florida,[2] the plaintiffs' claims as purchasers are limited to purchases of refined petroleum products as opposed to crude oil. The claims for damages are made under Clayton Act § 4 which provides:

> "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15 (1976).

In addition to the claims made on their own behalf, the states also assert claims as *parens patriae* under Clayton Act § 4C (15 U.S.C. § 15C) and as representatives of two classes of consumers. The first consumer class consists of all government entities that purchase refined petroleum products within the respective plaintiff states. The second class is composed of all other consumers of refined products within such plaintiff states.

**2.** Florida's complaint is broad enough to include purchases of crude oil. However, Florida has never suggested in any of its other papers or in oral argument that it purchased crude oil. For purposes of this discussion, Florida's claims will be treated as limited to purchases of refined products.

**3.** The defendants argue in their papers that while the Fifth Circuit uses "target area" language to describe its test, it actually applies a more restrictive test for standing similar to the so called "direct injury" test applied by several other circuits. In *Tugboat, Inc. v. Mobile Tow-*

Standing to sue under Clayton Act § 4 consists of two elements. The claimant must show that the alleged violation of the antitrust laws (1) directly caused injury (2) to the claimant's "business or property." Defendants' motions first challenge whether the plaintiffs as consumers are injured in their business or property within the meaning of the statute. This court previously has concluded that consumers are persons injured in their business or property (see the memorandum of decision dated September 15, 1977). Since then, the Supreme Court has reached the same conclusion on that issue in *Reiter v. Sonotone Corp.*, 439 U.S. 1065, 99 S.Ct. 830, 59 L.Ed.2d 30 (1979).

The remaining issue with regard to standing is whether the plaintiffs have alleged injury within the meaning of section 4. The Fifth and Ninth Circuits, in which the various consolidated cases arise, agree that the appropriate test for injury is the so-called "target area" test.[3] *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172 (5th Cir. 1976); *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122 (9th Cir.), *cert. denied sub nom. Morgan v. Automobile Manufacturers Association,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). The "target area" is "that area of the economy which is endangered by a break-down of competitive conditions in a particular industry." *Karseal Corporation v. Richfield Oil Corporation,* 221 F.2d 358, 362 (9th Cir. 1955). To apply the target area test, the area of the economy affected by the alleged violation must be identified, and then it must be determined whether the claimed injury occurred within that area. *In re Multidistrict,* 481 F.2d at 129.

*ing Co.,* 534 F.2d 1172 (5th Cir. 1976) a labor union and its members sued a tugboat firm and its union for conspiracy to monopolize tugboat services in the port of Mobile. The Fifth Circuit reversed a judgment dismissing the plaintiffs' claims and held that the plaintiffs, although employees, were within the area of the economy affected by the alleged violations and therefore had standing. This is very clearly an application of the "target area" test since the court focused on the economic impact of the violation rather than on the relationship between the parties.

■ The first cause of action in the complaints of Arizona, California, Florida, Oregon and Washington alleges restraint of trade and monopolization in the petroleum industry as a result of the vertically integrated structure of that industry and certain horizontal combinations. The effects of these alleged violations are set forth most fully in the Washington complaint as follows:

"These violations of the Sherman Act have had the following effects, among others:

a. The acquisition and control by defendants of substantially all foreign crude oil imports into PAD V [the West Coast market area].

b. The acquisition or control by defendants of all California crude oil production.

c. The acquisition or control by defendants of substantially all pipeline transportation of crude oil within California and PAD V.

d. The elimination of competition in the production of crude oil within California.

e. Arbitrary and artificial prices at which crude oil is purchased and sold within California.

f. Reduced competition in the sale of refined products within Washington and elsewhere in PAD V.

g. Increases in prices of refined products to artificial and noncompetitively high levels within Washington and elsewhere in PAD V."

Washington and the other state plaintiffs claim that they were damaged by the effect of antitrust violations on the prices they paid for petroleum products. They are not purchasers of crude oil; they do not use pipelines or other transportation facilities for crude oil; nor do they produce crude oil or market it. Therefore, the alleged injury could occur only in the "target area" described in paragraphs (f) and (g) above, the refined product market, and the plaintiffs have standing to sue for damages only as to those violations which affected this market.

■ The second cause of action in these five complaints asserts that the defendants conspired to restrain trade and monopolize commerce by creating an artificial scarcity of crude oil and refined petroleum products. With respect to this allegation, the Washington complaint, for example, states:

"These violations of the Sherman Act have had the following effects, among others:

a. The prices of refined products within Washington and PAD V have been raised to artificial and noncompetitively high levels.

b. Independent refiners have been deprived of lower price domestic crude oil.

c. Competition by independent gasoline wholesales has been reduced.

d. Customers for refined products have been allocated among defendants.

e. Purchasers of refined products have been deprived of the benefits of free and open competition among the defendants and their co-conspirators and have been forced to pay more for refined products than they would otherwise have paid."

To the extent that the plaintiffs alleged that the conspiracy to create an artificial scarcity had an effect upon the refined petroleum products market, the plaintiffs have standing to sue, that being the market in which they purchase. They do not have standing to sue for the effect of these acts upon the crude oil market or upon refiners of crude oil.

To summarize, the plaintiffs have alleged that they are purchasers of refined petroleum products. They have alleged further that the defendants restrained trade and monopolized commerce by engaging in certain horizontal combinations and agreements and by conspiring to create an artificial shortage of products. Finally, the plaintiffs have alleged that these illegal activities have had an effect upon the market for refined petroleum products. These allegations are sufficient to give the plaintiffs standing to sue under Clayton Act § 4. However, to the extent that the plaintiffs

have alleged activities that are directed at crude oil exploration, production, importation, transportation or refining, the plaintiffs lack standing to sue for injuries occurring in those areas of the economy.[4]

### B. *Clayton Act § 4C*

Section 4C of the Clayton Act provides, in part:

> "Any attorney general of a State may bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such state, in any district court of the United States having jurisdiction of the defendant, to secure monetary relief as provided in this section for injury sustained by such natural persons to their property by reason of any violation of sections 1 to 7 of this title." 15 U.S.C. § 15c(a)(1) 1976).

The elements of standing contained in section 4 of the Act are also present in section 4C. The plaintiff must show, in addition to authority to sue as *parens patriae*, that the natural persons in the state sustained (1) injury (2) to their property "by reason of" a violation of the Sherman Act.

█ The plaintiffs' *parens patriae* claims are based on the same allegations of misconduct as are the plaintiffs' proprietary claims, and to the extent that the plaintiffs have standing to sue under section 4, they have standing to sue for damages as *parens patriae* under section 4C of the Act.

### II. *STANDING TO SUE FOR INJUNCTIVE RELIEF*

The plaintiffs also ask for injunctive relief against the defendants under Clayton Act § 16 which provides:

> "Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the

parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that causes loss or damage is granted by courts of equity." 15 U.S.C. § 26 (1976).

█ It has been observed frequently that the standing requirements under section 16 are broader than those under section 4 of the Act. To have standing under section 16, a plaintiff must show (1) a threatened loss or injury cognizable in equity (2) proximately resulting from the alleged antitrust violation. *City of Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir. 1979); *Buckley Towers Condominium, Inc. v. Buchwald*, 533 F.2d 934 (5th Cir. 1977). In meeting the first requirement, it must be alleged that the claimant will suffer irreparable harm and that there is no adequate remedy at law. 14 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 105.02[8] (1978). Only the Washington complaint expressly alleges irreparable injury to the state, its citizens and the members of the consumer classes. However, all of the state plaintiffs allege that defendants are engaged in continuing violations of the antitrust laws and that this conduct results in injuries to the plaintiffs. Injuries from continuing violations of regulatory statutes are cognizable in courts of equity, and therefore the complaints will be construed liberally to meet the first requirement for standing under section 16.

The requirement that the plaintiffs show that their injuries were proximately caused by the alleged antitrust violations is essentially the same under sections 4 and 16 of the Clayton Act. It already has been concluded that plaintiffs have standing under section 4 to sue for violations of the antitrust laws that affect the market for refined petroleum products. Plaintiffs like-

---

**4.** The conclusions reached in this section also apply to the claims made by Arizona and California that the conduct alleged in their complaints constitutes violations of the antitrust laws of their respective states. Both Arizona Revised Statutes § 44–1408 (Suppl.1979) and California Business and Professions Code

§ 16750 (West Suppl.1979) contain language similar to Clayton Act § 4. This court concludes that the standing conferred by these state statutes is identical to that conferred by Clayton Act § 4. *See Saxer v. Philip Morris, Inc.*, 54 Cal.App.3d 7, 26, 126 Cal.Rptr. 327, 338 (1975).

wise have standing to seek injunctive relief under section 16 within the same limits.

■ As the Supreme Court noted in *Hawaii v. Standard Oil of California*, 405 U.S. 251, 261, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972) ". . . one injunction is as effective as 100." It is of little practical significance that a state has standing to sue for injunctive relief as *parens patriae* if the state also has standing to sue for injunctive relief in its proprietary capacity. For whatever it is worth, this court must conclude that plaintiffs have standing to sue for injunctive relief as *parens patriae* within the limitations previously mentioned.

### III.  *ILLINOIS BRICK*

The decision of the Supreme Court in *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) has had a significant impact on the scope of private antitrust enforcement under Clayton Act § 4. It held that an indirect purchaser from a person that violates the antitrust laws may not recover damages in an action under section 4. The Court rejected the argument that the claimant could prove damages by showing that the direct purchaser, a middleman that was charged an excessive price by the wrongdoer, passed on all or some of the overcharge to the claimant. The rationale for this decision was that (1) allowing proof of passed–on overcharges would greatly complicate antitrust treble damage suits, (2) defendants would be threatened with multiple liability if suits were brought by both direct and indirect purchasers, and (3) permitting use of the pass–on theory would give both direct and indirect purchasers inadequate incentive to sue since neither could recover the full amount of the overcharge.

The Supreme Court suggested two narrow exceptions to its rule against indirect purchaser claims. These exceptions were mentioned in the course of a discussion of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), in which the Court had held that an antitrust defendant could not avoid payment of damages to a direct pur-

chaser by claiming that some of the overcharge had been passed on to someone else. In *Illinois Brick*, the Court acknowledged that the reasons for the *Hanover Shoe* rule would not apply where the indirect purchaser had a contract with the direct purchaser for a fixed quantity of goods to be priced at cost plus a specific markup and such contract pre–dated the antitrust activity of the defendant. In a footnote to this discussion, the Court suggested a second exception, that the pass–on defense might be permitted where the direct purchaser "is owned or controlled by its customer." 431 U.S. at 736, n.16, 97 S.Ct. at 2070, n.16.

A.  *Claims Alleging Conduct (Other Than Price Fixing) Aimed at Crude Oil Producers, Refiners and Marketers*

■ This court has already concluded that the plaintiffs lack standing to sue for antitrust violations affecting crude oil production, refining, or marketing. Even if the plaintiffs had standing in these areas, *Illinois Brick* would prevent the plaintiffs from recovering damages. Anticompetitive activity at levels of the petroleum industry above the wholesale and retail marketing levels, except as incidental to a price fixing conspiracy involving wholesale or retail prices, would injure plaintiffs only indirectly. *Illinois Brick* provides an independent ground for dismissal of such claims.

B.  *Price Fixing Claims*

■ The rule of *Illinois Brick* is that in private antitrust actions under Clayton Act § 4, the claimant may recover only for damages incurred in a purchase directly from the wrongdoer. Subject to the following three exceptions, this is the rule that will be applied to plaintiffs' price fixing claims.

■ First, the plaintiffs may recover from the defendants for any illegal overcharges paid directly to the defendants' co–conspirators. In *City of Atlanta v. Chattanooga Founding and Pipeworks*, 127 F. 23 (6th Cir. 1903), *aff'd*, 203 U.S. 390, 27 S.Ct.

65, 51 L.Ed. 241 (1906) a municipality that bought pipe from conspiring pipe manufacturers was allowed to recover from the defendant for overcharges paid to the defendant's co–conspirator. The reason for this result is that conspirators are mutual agents and each is liable for the acts of the other. *Illinois Brick* does not alter this rule since no pass–on of overcharges is involved.

■ Second, the plaintiffs may recover from the defendants for indirect purchases made under pre–existing, fixed–quantity, cost–plus contracts with the direct purchaser. In announcing its decision in *Illinois Brick*, the Supreme Court made it clear that "[the] use of pass–on will be permitted symmetrically, if at all." 431 U.S. at 737, n.18, 97 S.Ct. at 2070, n.18. The Court recognized an exception to *Hanover Shoe* where the direct and indirect purchasers have a pre–existing cost–plus contract, and this exception must be applied to the benefit of both plaintiffs and defendants. None of the plaintiffs in the present cases has alleged that they were parties to such contracts, although Washington asserts that it suffered damage "in connection with purchases under circumstances which are the economic equivalent of pre–existing cost–plus contracts." (Washington is also the only state plaintiff to have had the benefit of reading the *Illinois Brick* decision before filing its complaint.) To the extent that a plaintiff can allege and prove that it held pre–existing, fixed–quantity, cost–plus contracts with its suppliers, it may avoid the impact of *Illinois Brick*. The court cannot at this time decide whether there are other circumstances that are the "economic equivalent" of cost–plus contracts or whether such circumstances would be recognized as exceptions to the *Illinois Brick* rule.

■ Third, the plaintiffs will be allowed to recover from the defendants for overcharges passed on by entities owned or controlled by the defendants. In connection with its discussion in *Illinois Brick* of the rule in *Hanover Shoe*, the Supreme Court, in the now famous footnote 16, stated:

"Another situation in which market forces have been superseded and the pass–on defense might be permitted is where the direct purchaser is owned or controlled by its customer." 431 U.S. at 736, n.16, 97 S.Ct. at 2070, n.16.

At least two federal circuits [5] appear to have recognized that the reasoning behind the footnote 16 exception applies to both offensive and defense uses of the pass–on theory.

*In re Sugar Industry Antitrust Litigation*, 579 F.2d 13 (3rd Cir. 1978) involved allegations of price fixing by sugar refiners. The plaintiff, a wholesale distributor of candy, purchased candy from a subsidiary of one of the defendant refiners. The district court entered summary judgment for the defendants on the basis of *Illinois Brick*. The Third Circuit reversed and held that the subsidiary would be treated as the alter ego of the parent sugar refiner. "To adopt any other view would invite evasion by the simple expedient of inserting a subsidiary between the violator and the first noncontrolled purchaser." 579 F.2d at 19.

In *Royal Printing, Inc. v. Kimberly–Clark Corporation*, 621 F.2d 323 (9th Cir. 1980) the Ninth Circuit recognized a control exception to *Illinois Brick* by permitting a purchaser of paper products to sue paper manufacturers for antitrust violations even though the plaintiff had made its purchases through divisions or subsidiaries of the defendant manufacturers. The marketing entities carried the products of their parent corporations and other paper manufacturers, so that, in some purchases, the manufacturer did not own the supplier, but the supplier was owned by one of the participants in the conspiracy. The Ninth Circuit recognized that there was a small chance that the marketing companies might sue the parent or its co–conspirator and that there was a remote chance of imposing multiple liability on the defendants, but concluded that the broader interest in effective antitrust en-

---

**5.** In *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1163 (5th Cir. 1979) the Fifth Circuit discussed a "control" exception to *Illi-* *nois Brick* but concluded that such an exception would not apply in the case before it.

forcement required that the indirect purchaser be allowed to bring suit in this situation.

On the basis of these decisions, this court is able to conclude that an indirect purchaser that purchases from an entity owned or controlled by the wrongdoer may sue to recover passed–on overcharges and is excepted from the general rule of *Illinois Brick*. The question of how much control is required to meet the exception cannot be decided until a factual record is developed. The degree of ownership, profit taking, or ability to set prices will be important considerations in determining whether the intermediate seller is "controlled."

To summarize, with respect to the plaintiffs' claims that the defendants conspired to fix prices either at the wholesale or retail level, the plaintiffs will be allowed to seek recovery only as to direct purchases from a defendant, a co–conspirator, sellers with whom the plaintiffs had pre–existing, fixed–quantity, cost–plus contracts, or an entity controlled by a conspirator.

### C. The Umbrella Theory

The plaintiffs have argued that where a price fixing conspiracy exists in a market, non–conspirators are able to charge higher prices than in a competitive market. The price fixed by the conspiracy is said to create a price "umbrella" allowing non–conspirators in the market to raise their prices. The plaintiffs contend that a purchaser from a non–conspirator should be allowed to recover from the conspirators the difference between the competitive market price and the higher price in the constricted market. The plaintiffs correctly observe that *Illinois Brick* does not specifically address this situation since the price charged by non–conspirators does not contain any overcharge passed on from the defendants. However the reasoning behind *Illinois Brick* is applicable to the umbrella pricing theory and prompts this court to conclude that recovery should not be allowed under such a theory.

This court will follow the decision of the Third Circuit in *Mid–West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3rd Cir. 1979). The defendants in that case were accused of fixing the price of paper packaging for consumer goods. The Court of Appeals affirmed a grant of summary judgment dismissing the suit as to a plaintiff, Murray's, which purchased paper bags from a non–conspiring competitor of the defendants at prices allegedly made possible only by the umbrella effect of the conspirators' prices. The court rejected the umbrella theory for three reasons. First, Murray's had no direct relationship with the defendants and the defendants gained nothing from Murray's purchases. Second, the non–conspiring competitors were free to set prices as they wished and might have charged the same price without regard to the defendants' conduct. Third, the antitrust laws would be enforced most effectively by the direct purchasers from the defendants.

The result in the *Mid-West* case is consistent with the teachings of *Illinois Brick*. *Illinois Brick* limited proof of passed-on overcharges because (1) such proof would involve complex economic analysis, (2) the defendant might be exposed to multiple liability and (3) the effectiveness of the treble damage remedy might be destroyed. Similar problems are involved in the umbrella theory of recovery.

First, proof of injury under the umbrella theory would involve complex economic analysis. The non-conspirator makes independent decisions concerning price and output. In order for a plaintiff to recover, the effect of the umbrella price on these pricing and output decisions would have to be shown. This sort of analysis is exactly what the Supreme Court sought to avoid in *Illinois Brick*.

Second, where the plaintiff is allowed to recover from a defendant for excessive prices charged by a non–conspirator, the defendant is not disgorging illegally earned profits—these have gone to the competitor. There is a possibility for ruinous recovery in allowing treble damages to be awarded in such circumstances.

Third, the direct purchaser from the defendant is the most effective enforcer of the antitrust laws. In a price fixing situation, both purchasers from the defendant and purchasers from non-conspirators are potentially injured. The purchaser from the non-conspirator might be able to prove price fixing by the defendant but be unable to quantify the injury. Normally, the direct purchaser would have much less difficulty in this respect. The direct purchaser has the greatest incentive to sue and the easiest case to prove and would be, therefore, the most effective enforcer of the antitrust laws.

For these reasons, the plaintiffs will not be allowed to prove damages incurred in purchases from non-conspiring competitors of the defendants. Claims based on such purchases will be dismissed.

### D. Vertical Conspiracy

The plaintiffs have suggested in their papers that they may be able to prove a conspiracy between the defendant oil companies and the independently owned retail service stations that sell defendants' refined products under brand names. The plaintiffs assert that proof of such a vertical conspiracy would not be barred by *Illinois Brick*. There is authority for plaintiffs' arguments in *Gas–A–Tron v. American Oil Company*, 1977–2 Trade Cases (CCH) ¶ 61,-789 (D.Ariz.1977).

However, the plaintiffs have not, as yet, alleged a vertical conspiracy between the oil companies and retail dealers. This court is not inclined to entertain such an allegation unless such retail dealers are joined as defendants in these lawsuits. The reasons for requiring joinder of co–conspirators are set forth in *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979). In that case, cattle producers sued retail supermarkets for setting depressed beef prices. In order to avoid the impact of *Illinois Brick*, the plaintiffs offered to amend their complaints to allege that the supermarkets had conspired with packers and slaughterhouses to set market prices for beef cattle. The plaintiffs contended, as do plaintiffs in

this action, that such a conspiracy would be excepted from the rule in *Illinois Brick*. The Fifth Circuit responded as follows:
"Whatever the merits of the arguments for such an exception in general, we do not think that the reasoning of Illinois Brick permits recognizing the exception when, as here, the alleged co–conspirator middlemen are not named as parties defendant. Absent joinder of the packers and slaughterhouses, the rule forbidding one antitrust conspirator from maintaining an action against another for damages arising from the joint activity would not protect these defendants from the risk of overlapping liability. The retail chains could not, in a suit brought by the packers, use a judgment or finding of vertical conspiracy in the instant case to prevent the packers from successfully asserting in their own lawsuit that they did not in fact conspire with the chains and are therefore not barred by the co–conspirator doctrine from recovering damages from the retail chains. . . . Because the packers are not parties to this suit, the possibility of inconsistent adjudications on the issue of the existence of a vertical conspiracy leaves the defendants subject to the risk of multiple liability that the *Illinois Brick* Court found unacceptable." 600 F.2d at 1163.
*Accord, Dart Drug Corporation v. Corning Glass Works*, 480 F.Supp. 1091 (D.Md.1979).

█ The plaintiffs are entitled to prove their case by showing that the defendant oil companies conspired with retail dealers to set prices at the retail level. However, if they intend to pursue this theory of liability, they must allege a vertical conspiracy in their complaints and join the retail dealers as parties defendant.

### E. Injunctive Relief

█ The defendants have argued in their motions that *Illinois Brick* places the same limitations on claims for injunctive relief as on suits for damages. The defendants reason that since the plaintiffs must show injury to obtain injunctive relief and since proof of injury to an indirect purchas-

er would involve the same complex calculations as proof of damages, *Illinois Brick* bars recovery.

This argument has been rejected by the Third and Fifth Circuits and a district court in Maryland. *Mid–West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3rd Cir. 1979); *In re Beef Products Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979); *Dart Drug Corporation v. Corning Glass Works*, 480 F.Supp. 1091 (D.Md.1979). The courts have reasoned that, first, in a suit for injunctive relief the plaintiff does not have to quantify his injury and therefore complex economic analysis is not necessary. Second, the defendant in a suit for injunctive relief is not threatened with multiple liability since no damages are awarded. Third, a bar against suits for injunctive relief by indirect purchasers would leave a significant gap in antitrust enforcement where the federal government or direct purchasers are unwilling to bring suit. Therefore none of the reasons given for the rule in *Illinois Brick* apply to claims for injunctive relief under section 16. This court accepts the above–mentioned reasoning and will follow it in the present case.

### IV.  *CONCLUSION*

For the reasons expressed above, the defendants' motions to dismiss will be granted in part and denied in part as follows:

First, claims of conduct, other than price fixing, directed against the exploration, production, transportation, marketing or refining of crude oil will be dismissed for lack of standing under Clayton Act §§ 4 and 4C.

Second, even if the plaintiffs had standing to sue for damages resulting from antitrust violations other than price fixing in the exploration, production, transportation, marketing or refining of crude oil, *Illinois Brick* would prevent them from proving damages and would require that these claims be dismissed.

Third, to the extent that the plaintiffs claim that the defendants violated the antitrust laws by setting or manipulating prices at the wholesale or retail levels, the plaintiffs will be allowed to seek damages only as to direct purchases from defendants, their co–conspirators, sellers with whom plaintiffs had fixed–quantity, cost–plus contracts pre–dating the alleged violations, or entities owned or controlled by defendants.

Fourth, the plaintiffs will not be allowed to recover damages for purchases made from firms that competed with defendants but did not conspire with them to violate the antitrust laws.

Fifth, the plaintiffs may amend their complaints to allege that defendants conspired with retail dealers of petroleum products only if the retail dealers are joined as parties defendant.

Sixth, the plaintiffs are entitled to seek injunctive relief for antitrust violations directed against the refined product market regardless of whether the plaintiffs purchased directly or indirectly from the defendants.

### REVISED ORDER REGARDING STANDING AND ILLINOIS BRICK

The order filed by this court on July 29, 1980, regarding standing and *Illinois Brick* is hereby withdrawn and the following substituted:

For the reasons set forth in the memorandum of decision accompanying this order, IT IS HEREBY ORDERED:

First, all claims of antitrust violations directed against the exploration, production, transportation, marketing or refining of crude oil, other than claims of fixing wholesale or retail prices of refined products, are dismissed.

Second, to the extent that the plaintiffs claim that the defendants violated the antitrust laws by setting or manipulating prices at the wholesale or retail levels, the plaintiffs will be allowed to seek damages only as to direct purchases from the defendants, their co–conspirators, sellers with whom plaintiff had fixed–quantity, cost–plus contracts pre–dating the alleged violations, or entities owned or controlled by the defendants or their co–conspirators.

Third, all claims for damages based on purchases from firms that competed with the defendants but did not conspire with them to violate the antitrust laws are dismissed.

Fourth, the plaintiffs may amend their complaints to allege that defendants conspired with retail dealers of petroleum products only if the conspiring retail dealers are joined as parties defendant.

Fifth, the plaintiffs may seek injunctive relief for antitrust violations directed against the refined product market regardless of whether the plaintiffs purchased directly or indirectly from defendants or their co–conspirators.