[No. D015389. Fourth Dist., Div. One. Mar. 25, 1993.]

CELLULAR PLUS, INC. et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
U.S. WEST CELLULAR OF CALIFORNIA, INC., et al., Real Parties in Interest.

COUNSEL

Franklin and Franklin, J. David Franklin and Alexander M. Schack for Petitioners.

No appearance for Respondent.

Gibson, Dunn & Crutcher, J. Anthony Sinclitico III, Morrison & Foerster, Philip E. Smith, Sullivan, Walsh & Wood, Scott E. Wood, Hughes, Hubbard & Reed, William T. Bissett, Sheppard, Mullin, Richter & Hampton, Michael J. Weaver, Seltzer, Caplan, Wilkins & McMahon, Brian T. Seltzer, Sullivan, Hill, Lewin & Markham, Donald G. Rez, Brobeck, Phleger & Harrison, Daniel G. Lamb, Jr., Pillsbury, Madison & Sutro, Douglas R. Tribble, Armour, Goodin, Schlotz & MacBride, Harold E. Kruth, Winthrop, Stimson, Putnam & Roberts and Stanley M. Gorinson for Real Parties in Interest.

OPINION

WORK, Acting P. J.—This case involves a lawsuit by a number of individual consumers and corporate sales agents, including Cellular Plus, Inc., and others (Cellular Plus), against the two licensed providers of cellular telephone service in San Diego County. The trial court granted demurrers to causes of action for wholesale price fixing and retail price fixing under the Cartwright Act. Its decision apparently was based upon the fact the Public Utilities Commission (PUC) regulates the rates charged by the providers, so as to either preclude a violation of the Cartwright Act or require the causes to be brought before the PUC in the first instance. We conclude valid causes of action can be brought before the trial court for wholesale and retail price fixing despite the regulatory authority of the PUC, and accordingly we issue a writ of mandate and direct the court to try first the issue of liability. We further instruct the court to consider, before trying the issue of damages, whether and at what point a PUC determination must be obtained as to what lower rates it would have approved had application been made.

ISSUES

1. Does Cellular Plus have standing to bring causes of action for wholesale and retail price fixing?

2. Are the causes of action by Cellular Plus sufficiently specific under California pleading requirements?

3. Has Cellular Plus alleged any injury which is compensable under the Cartwright Act?

4. Does the regulatory authority of the PUC preclude a violation of the Cartwright Act?

5. Must the wholesale and retail price fixing claims under the Cartwright Act initially be brought before the PUC by reason of possible primary jurisdiction over the claims?

### FACTUAL AND PROCEDURAL BACKGROUND

The Federal Communications Commission (FCC) has authorized two facilities-based carriers to provide cellular communications service in the San Diego area. One is U.S. West Cellular of California, Inc. (U.S. West) and the other is PacTel Cellular (PacTel). The PUC granted certificates of public convenience and necessity to U.S. West and PacTel authorizing them to provide cellular telephone service in the San Diego area. Cellular Plus, Inc., and the other corporate petitioners were agents of U.S. West and engaged in the business of obtaining cellular telephone service customers for U.S. West, in addition to the sale of cellular telephone equipment and related services. The individual petitioners were customers of U.S. West and PacTel and purchased cellular service from them.

The PUC formally approved PacTel's rates for cellular telephone service in the San Diego area in its Decision No. 85-04-23 dated April 3, 1985. The PUC approved the rates of Gencom, Incorporated (Gencom) in its Decision No. 85-12-023 dated December 4, 1985. U.S. West acquired Gencom's San Diego cellular business soon thereafter, a transfer the PUC approved in its Decision No. 86-05-077 dated May 28, 1986, and U.S. West assumed Gencom's schedule of approved rates. As Cellular Plus contends, the wholesale and retail prices charged by U.S. West and PacTel for cellular telephone service have remained almost identical since at least 1987 because of their alleged agreement to maintain that status.

Cellular Plus filed its initial complaint in this action in January 1990. After the trial court on two separate occasions granted demurrers with leave to amend, Cellular Plus filed its third amended complaint. The complaint sets forth 31 separate causes of action. The third and twenty-second causes of action are for, respectively, wholesale and retail price fixing of cellular

telephone service rates in the San Diego County area. On June 28, 1991, the trial court sustained U.S. West's and PacTel's demurrers to the third and twenty-second causes of action without leave to amend. As to the third cause of action for wholesale price fixing, the court stated in its notice of ruling:

"The demurrer is sustained without leave to amend. . . . The Public Utilities Commission has approved the prices charged by US West and PacTel. They are the only companies authorized to provide cellular service in San Diego County, thereby precluding a violation of the Cartwright Act."

As to the 22d cause of action, the court stated:

"The demurrer is sustained without leave to amend because the Public Utility [*sic*] Commission has jurisdiction over rates charged for cellular service. The demurrer is sustained consistent with the Third Cause of Action."

After its motion for reconsideration was denied, Cellular Plus filed this petition for writ of mandate asking that the court's rulings sustaining the demurrers to the third and twenty-second causes of action be overruled.[1]

After issuing our initial opinion in this matter, we granted PacTel's motion for rehearing in order to more fully address the issue of antitrust injury. This opinion on rehearing expands our discussion of antitrust injury and also adds consideration of the individual consumer plaintiffs where appropriate.

## ANALYSIS

### Standard of Review

■ A demurrer raises only a question of law, as the allegations of fact contained in the complaint must be accepted as true by the court for purposes of review. (*Strang* v. *Cabrol* (1984) 37 Cal.3d 720, 722 [209 Cal.Rptr. 347, 691 P.2d 1013]; *Thompson* v. *County of Alameda* (1980) 27 Cal.3d 741, 746 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701].) ■ A demurrer tests the sufficiency of a pleading, and it is error for a court to sustain a demurrer where the allegations adequately state a cause of action under any legal theory. (*Von Batsch* v. *American Dist. Telegraph Co.* (1985) 175

---

[1]After denying Cellular Plus's motion for reconsideration of the court's rulings sustaining the demurrers to these two causes of action, the court then granted the defendants' motion to strike the individual plaintiffs from all remaining causes of action.

Cal.App.3d 1111, 1117 [222 Cal.Rptr. 239]; *Banerian* v. *O'Malley* (1974) 42 Cal.App.3d 604, 611 [116 Cal.Rptr. 919].) Applying this standard of review, we address each of the issues in the order set forth above.

*Issue 1: Cellular Plus Has Standing*

PacTel contends, and U.S. West joins in such contention, Cellular Plus does not have standing to bring the price fixing claims, because Cellular Plus has not alleged a sufficient "antitrust injury" under the Cartwright Act.[2] In support of its contention, PacTel cites two federal antitrust cases which held employees do not have standing to sue their employers for antitrust violations. (See *Feeney* v. *Chamberlain Mfg. Corp.* (5th Cir. 1987) 831 F.2d 93, 96; *Stein* v. *United Artists Corp.* (9th Cir. 1982) 691 F.2d 885, 896.) However, the corporate plaintiffs of Cellular Plus are not employees of U.S. West. They are merely independent agents of U.S. West, and, as a result, are considered separate entities which normally would have standing to sue under the Cartwright Act. Further, the individual plaintiffs, as customers, cannot in any sense be viewed as employees of U.S. West.

PacTel also cites *Kolling* v. *Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 723 [187 Cal.Rptr. 797], as requiring an antitrust plaintiff to be within the "target area" of the antitrust violation in order to have standing to sue. According to *Kolling*, an "antitrust injury" is the "type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' act unlawful." (*Ibid.*) PacTel asserts Cellular Plus must be either a consumer or a competitor in order to have standing to make price fixing claims. We find no merit in this assertion. The court in *Kolling* went on to state:

"The antitrust laws are designed to protect the public, as well as more immediate victims, from a restraint of trade or monopolistic practice which has an anticompetitive impact on the market. [Citations.] Thus, the antitrust laws allow private enforcement by an aggrieved party, even if the complainant be but a single merchant. [Citation.]

"We are persuaded that respondents suffered the type of injury which the antitrust laws seek to prevent. As said in *Lee-Moore Oil Co.* v. *Union Oil Co.* (4th Cir. 1979) 599 F.2d 1299, 1303, 'the case will be quite rare in which a *per se* violation of the Sherman Act does not cause competitive injury.' " (*Kolling* v. *Dow Jones & Co.*, *supra*, 137 Cal.App.3d at p. 724.) Thus, the

---

[2]The Cartwright Act is California's version of the federal Sherman Act and sets forth California's antitrust laws, including price fixing prohibitions. The Cartwright Act is found at Business and Professions Code section 16700 et seq.

court in *Kolling* concluded the injuries alleged in that case were not secondary, consequential, or remote, but the direct result of the unlawful conduct and were the kind of injuries the antitrust laws seek to prevent. (*Ibid.*)

Another California case describes the broad class of persons and injuries which the Cartwright Act intends to cover. In *Saxer* v. *Philip Morris, Inc.* (1975) 54 Cal.App.3d 7, 26 [126 Cal.Rptr. 327], the court stated:

"Plaintiff's injuries were not 'secondary' or 'consequential,' since they did not result from injury to third parties; they were not 'remote,' for they were the direct result of the allegedly illegal conduct. [Citations.] The fact that plaintiff was not a competitor of defendants presents no obstacle to recovery for '*The statute does not confine its protection to consumers, or to purchasers, or to competitors,* or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. [Citations.] The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.' (*Mandeville Farms* v. *Sugar Co.*, 334 U.S. 219, 236, . . . reh. den., 334 U.S. 835 . . . .)" (Italics added.)

We look to the plain meaning of the statute to determine whether Cellular Plus has stated a sufficient "antitrust injury" in order to have standing. Business and Professions Code[3] section 16750, subdivision (a) states in part:

"Any person who is *injured in his or her business or property by reason of* anything forbidden or declared unlawful by this chapter, may sue therefor in any court having jurisdiction . . . .

"This action may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of *whether* such injured person *dealt directly or indirectly* with the defendant." (Italics added.) As to the corporate plaintiffs, Cellular Plus alleges in its complaint that, as sales agents for U.S. West, the corporate plaintiffs lost sales as a result of the prices artificially inflated by U.S. West and PacTel and suffered damages in excess of $1 million. As to the individual plaintiffs, Cellular Plus alleges that, as consumers and subscribers of cellular service, the individual plaintiffs paid artificialy inflated prices. Such allegations are clearly by persons who are "injured in his or her business or property" as required by section 16750, subdivision (a).

---

[3]All statutory references are to the Business and Professions Code unless otherwise specified.

In order to allege a sufficient "antitrust injury," Cellular Plus must also allege such injuries were sustained "by reason of" the unlawful price fixing. (§ 16750, subd. (a).) In interpreting this phrase under section 4 of the federal Clayton Act (15 U.S.C. § 15), the United States Supreme Court stated:

"Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury . . . should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.' [Citation.]" (*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.* (1977) 429 U.S. 477, 489 [50 L.Ed.2d 701, 712, 97 S.Ct. 690], fn. omitted, original italics.) In a later decision, the Supreme Court noted the plaintiff's losses must "stem from an *anticompetitive* aspect of the defendant's conduct." (*Atlantic Richfield Co.* v. *USA Petroleum Co.* (1990) 495 U.S. 328, 340-341 [109 L.Ed.2d 333, 348, 110 S.Ct. 1884], fn. omitted, original italics.) These and other federal cases cited by PacTel, however, merely define the term "antitrust injury" for purposes of federal antitrust laws, such as the Clayton Act. Although California law similarly requires an "antitrust injury," the scope of that term is broader. Section 16750, subdivision (a), as quoted above, provides for lawsuits by injured persons who dealt either "directly or indirectly" with the antitrust law offenders. This broader California definition resulted from the United States Supreme Court's restrictive decision in *Illinois Brick Co.* v. *Illinois* (1977) 431 U.S. 720 [52 L.Ed.2d 707, 97 S.Ct. 2061], wherein the court precluded a lawsuit under federal antitrust law by indirect purchasers. (*Crown Oil Corp.* v. *Superior Court* (1986) 177 Cal.App.3d 604, 608-609 [223 Cal.Rptr. 164].) Thus, the more restrictive definition of "antitrust injury" under federal law does not apply to section 16750.

The exact parameters of "antitrust injury" under section 16750 have not yet been established through either court decisions or legislation. However, as quoted above, the *Kolling* decision generally defined "antitrust injury" as the "type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful." (*Kolling* v. *Dow Jones & Co., supra,* 137 Cal.App.3d at p. 723.) Upon the facts alleged in this case, we conclude both the corporate and individual plaintiffs have alleged a sufficient "antitrust injury" to maintain actions for wholesale and retail price fixing.

In the complaint, the individual plaintiffs allege they paid, as consumers, excessive prices for cellular service due to the price fixing agreement between U.S. West and PacTel. Thus, they were injured directly by the

alleged retail price fixing and indirectly by the alleged wholesale price fixing. Clearly, the individual plaintiffs allege injuries of the type section 16750 seeks to prevent and which stem from the "anticompetitive aspect" of U.S. West's and PacTel's alleged conduct. The corporate plaintiffs, on the other hand, allege a different type of "antitrust injury." They allege lost sales, as sales agents of U.S. West, resulting from the anticompetitive conduct of U.S. West and PacTel. However, not all business entities claiming sales were lost due to price fixing necessarily have suffered a sufficient "antitrust injury." (See, e.g., *Bodie-Rickett and Associates* v. *Mars, Inc.* (6th Cir. 1992) 957 F.2d 287; *Brian Clewer, Inc.* v. *Pan Amerian World Airways, Inc.* (C.D.Cal. 1986) 674 F.Supp. 782.) However, "antitrust injury" consisting of lost sales can be sufficient if such losses are of the type section 16750 seeks to avoid and stem from the anticompetitive aspect of the alleged conduct. As sales agents of U.S. West, the corporate plaintiffs were in the direct line of effecting sales by U.S. West to U.S. West customers. The corporate plaintiffs were U.S. West's intermediaries in effecting such sales. Thus, they were not some unrelated competitor or other third party, but they were directly involved in U.S. West's chain of distribution. As a result, the alleged price fixing by U.S. West and PacTel resulting in artificially high prices would directly and inherently reduce the amount of sales by U.S. West's sales agents. Accordingly, we conclude the corporate plaintiffs allege sufficient facts to place their injuries within the type section 16750 seeks to prevent and directly stem from the "anticompetitive aspect" of U.S. West's and PacTel's alleged conduct.[4]

Cellular Plus has alleged a legally sufficient "antitrust injury" as to both the corporate and individual plaintiffs. Accordingly, we hold Cellular Plus, including both corporate and individual plaintiffs, has standing to make its price fixing claims under its third and twenty-second causes of action.

*Issue 2: Cellular Plus Has Sufficiently Pled Its Causes of Action*

 PacTel also contends, and U.S. West joins in such contention, that Cellular Plus has not sufficiently pled its third and twenty-second causes of

---

[4]We further note there is no danger of duplicate recovery by recognizing claims by both consumers who paid too much for cellular service and sales agents who lost sales. This is because price fixing resulting in artificially high prices can cause two separate types of injuries. As to actual sales made to consumers, the injury to such consumers is the excessive portion of the price they actually paid for the service. As to sales agents, however, their injuries result from the logical effect that excessive prices have on customers or potential customers. When prices are too high, a certain portion of the potential market is "priced out of the market," resulting in artificially reduced total sales. Thus, the sales agents are precluded from obtaining sales that otherwise would have been made had it not been for the price fixing agreement.

action under the more stringent pleading standards required by *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315-328 [70 Cal.Rptr. 849, 444 P.2d 481]. Although PacTel is correct in contending *Chicago Title* requires more factually specific pleadings for Cartwright Act claims, we conclude Cellular Plus has met those standards.

The California Supreme Court in *Chicago Title* adopted the statement from *Wise* v. *Southern Pacific Co.* (1963) 223 Cal.App.2d 50, 64-65 [35 Cal.Rptr. 652], that:

" 'To state a cause of action for conspiracy, the complaint must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts. [Citations.]' " (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.*, *supra*, 69 Cal.2d at p. 316.) Thus, the Supreme Court applied the pleading requirements for a civil conspiracy action under common law to a statutory action under the Cartwright Act for antitrust conspiracies. The court in *Chicago Title* stated "[g]eneral allegations of the existence and purpose of the conspiracy are insufficient and appellants must allege specific overt acts in furtherance thereof." (*Id.* at p. 318.) In *Chicago Title* the appellants conceded they did not allege facts, but contended general allegations of statutory violations were sufficient to state an antitrust cause of action. (*Id.* at p. 317.) However, the court concluded the "vague and conclusionary pleadings fail to allege facts which might reasonably be construed to reveal a wrongful combination," and it held the "lack of factual allegations of specific conduct in furtherance of a conspiracy or combination" made the pleadings insufficient to state a cause of action under antitrust laws. (*Id.* at pp. 315, 327.)

 We believe the rule established by *Chicago Title* essentially is that a plaintiff cannot merely restate the elements of a Cartwright Act violation. Rather, in order to sufficiently state a cause of action, the plaintiff must allege in its complaint certain facts in addition to the elements of the alleged unlawful act so that the defendant can understand the nature of the alleged wrong and discovery is not merely a blind "fishing expedition" for some unknown wrongful acts. (See also *G.H.I.I.* v. *MTS, Inc.* (1983) 147 Cal.App.3d 256, 265-266 [195 Cal.Rptr. 211, 41 A.L.R.4th 653].)

 Applying this Cartwright Act pleading rule to the complaint in this action, we must compare the language of the complaint to the language of the Cartwright Act and determine whether there are any meaningful allegations of overt actions or other facts over and above the mere statutory

 

elements of the alleged violation. Section 16726 states that every "trust" is unlawful. Section 16720 defines such an unlawful "trust" as:

". . . a combination of capital, skill or acts by two or more persons for any of the following purposes:

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(d) To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity . . . .

"(e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they . . . :

"(1) Bind themselves not to sell . . . any article . . . of trade, [or] use, . . . below a common standard figure, or fixed value.

"(2) Agree in any manner to keep the price of such article . . . at a fixed or graduated figure.

"(3) Establish or settle the price of any article . . . between them . . . so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers . . . ." Section 16756 sets forth minimum requirements for pleading under the Cartwright Act, although, as discussed above, the *Chicago Title* decision adds the requirement of pleading specific facts. Section 16756 states that for any complaint alleging violations of the Cartwright Act:

". . . it is sufficient to state the purpose or effects of the trust . . . and that the accused is a member of, acted with, or in pursuance of it . . . without giving its name or description, or how, when and where it was created."

 In general, a Cartwright Act price fixing complaint must allege specific facts in addition to stating the purpose or effect of the price fixing agreement and that the accused was a member of or acted pursuant to the price fixing agreement.

 The complaint of Cellular Plus makes a number of specific factual allegations over and above the statutory elements of the Cartwright Act. The third cause of action for wholesale price fixing includes allegations as to the time of the alleged agreement. Specifically, it alleges:

"32. Beginning at a time unknown to Plaintiffs, but *within the last four years*, Defendants . . . combined, conspired or agreed to fix prices at which cellular radio service is sold in intrastate commerce at wholesale in the San Diego County market." (Italics added.) In addition to alleging that such agreement is an unlawful trust under sections 16720 and 16726, Cellular Plus alleges the following additional specific facts:

"35. In furtherance of the conspiracy, Plaintiffs are informed and believe and thereon allege that *Defendant[s] had meetings or discussions between themselves* for the purpose of insuring that the price that was charged for cellular service at wholesale in the San Diego County market was the same. Also in furtherance of the conspiracy, said *Defendants used their best efforts to insure that the prices charged at wholesale* in the San Diego County market *were the same* to the customers of each carrier.

"35A. The *purpose* of said combination, conspiracy or agreement *was to create artificially higher wholesale prices* at wholesale in the San Diego County market, thereby providing said Defendants with substantially higher profits than would otherwise be the case based upon a truly competitive marketplace. The effect . . . has been to create artificially higher prices at wholesale in the San Diego County market for cellular radio service and as a consequence, free competition has suffered an injury. In furtherance of the . . . conspiracy agreement, *Defendants . . . have charged identical prices* at wholesale to its customers for cellular radio service from the time of commencement of said combination, conspiracy or agreement." (Italics added.) We conclude the allegations as to time (i.e., within the last four years) and general details of the nature and purpose of the alleged wholesale price fixing agreement are sufficient specific facts to meet the standards of section 16726 and *Chicago Title*. Accordingly, Cellular Plus has sufficiently pled a cause of action for wholesale price fixing under the Cartwright Act.

As to the 22d cause of action for retail price fixing, Cellular Plus has alleged:

"166. Beginning at a time unknown to Plaintiffs, but *within the last 4 years*, Defendants . . . combined, conspired or agreed to fix prices at which cellular radio service is sold in intrastate commerce at retail in the San Diego County market.

". . . . . . . . . . . . . . . . . . . . . . . . .

"168. In furtherance of the conspiracy, said *Defendants had meetings in which wholesale prices were discussed, an agreement was reached that said Defendants would charge the same or nearly the same rates for cellular service at retail* in the San Diego County market. Also in furtherance of the conspiracy, said *Defendants have charged the same or nearly the same retail rates* for cellular service in the San Diego County market. Attached hereto [are copies of Defendants' retail pricing sheets for parts of 1989 and 1990]. . . . The monthly access charge is exactly the same and the cost per minute is almost identical. Prior to the time that this lawsuit was initially filed, the retail pricing of cellular radio service by said Defendants was exactly the same." (Italics added.) We conclude the allegations as to time and general details of the nature and effect of the retail price fixing agreement are sufficient allegations of specific fact under the requirements of section 16726 and *Chicago Title.* Accordingly, Cellular Plus has sufficiently pled a cause of action for retail price fixing under the Cartwright Act.

It is important to acknowledge the practical inability of a typical plaintiff to allege at the outset of its Cartwright Act claim the full details of an alleged price fixing agreement. Because of the well-known wrongfulness of price fixing agreements, conspirators rarely make such agreements in the open or document their illicit agreements. Rather, it is usually the situation that such agreements are made covertly, thereby making it difficult for a plaintiff to allege the full details of such price fixing agreement prior to its ability to engage in the "rock-turning" allowed by discovery. As the court in *Saxer* observed:

"While the complaint may not be as artistically drawn as might be desired, it is the exception rather than the rule to discover a model pleading in antitrust litigation. Perhaps this is the result of the very nature of the action itself. *Antitrust schemes generally are conceived in secrecy and live their lives in relative obscurity.* It is only when they are called to face their creator that they betray their theretofore seemingly innocuous existence." (*Saxer* v. *Philip Morris, Inc., supra,* 54 Cal.App.3d at pp. 26-27, italics added.)

Although the court in *Chicago Title Ins. Co.* v. *Great Western Financial Corp., supra,* 69 Cal.2d at page 326, expressed concerns about the "dangerous vice inherent" in a complaint that is "ambiguous and investigatory in nature" which could lead to "a blanket license to indulge in interrogatories, depositions, and motions to produce ad infinitum, ad nauseam," we conclude the causes of action by Cellular Plus for wholesale and retail price fixing are sufficiently definite and contain specific facts so as to define the exact nature

of the alleged violations and communicate to U.S. West and PacTel the scope of the price fixing allegations. As the court in *Saxer* concluded, "multifarious facts illustrative of nefarious agreements need not be alleged if the pleadings, liberally construed, are capable of an interpretation exhibiting the existence of facts constituting the combination, its object, and achievement in restraint of trade." (*Saxer* v. *Philip Morris, Inc., supra*, 54 Cal.App.3d at p. 20.) Thus, we hold Cellular Plus has sufficiently pled its causes of action for wholesale and retail price fixing.

*Issue 3: Cellular Plus Has Alleged a Compensable Injury*

 PacTel also contends, and U.S. West joins in such contention, that Cellular Plus has not alleged any compensable injury under the Cartwright Act because of the PUC's approval of the cellular telephone service rates of U.S. West and PacTel. We find such contention to be without merit. Section 16750 allows damages for a person "who is injured in his or her business or property by reason of" unlawful price fixing. As discussed above, Cellular Plus has alleged the corporate plaintiffs have lost sales and individual plaintiffs paid excessive prices as a result of the alleged unlawful price fixing agreement and suffered in excess of $1 million in damages. Cellular Plus clearly has alleged injury to its business and property.

 However, PacTel argues that such injury to Cellular Plus is not compensable under the Cartwright Act. PacTel cites no California authority for its position. Rather, it contends a federal court decision under the Sherman Act is controlling. PacTel overstates the weight of authority that federal decisions regarding the Sherman Act have upon decisions California courts make regarding the Cartwright Act. As one California court recently stated:

"California's Cartwright Act is patterned after the federal Sherman Anti-Trust Act (15 U.S.C. § 1 et seq.) and decisions under the latter act are applicable as an aid to a decision in interpreting the former. [Citations.]" (*Truta* v. *Avis Rent A Car System, Inc.* (1987) 193 Cal.App.3d 802, 822 [238 Cal.Rptr. 806].) Similarly, the California Supreme Court has stated that "federal cases interpreting the Sherman Act are applicable in construing our state laws." (*Mailand* v. *Burckle* (1978) 20 Cal.3d 367, 376 [143 Cal.Rptr. 1, 572 P.2d 1142], fn. omitted.) Accordingly, the appropriate use of federal cases interpreting the Sherman Act is as an aid in interpreting our own Cartwright Act, not as controlling precedent as PacTel would suggest.

 PacTel cites the federal case of *Keogh* v. *Chicago & N.W. Ry. Co.* (1922) 260 U.S. 156 [67 L.Ed. 183, 43 S.Ct. 47], superseded by statute on

other grounds as stated in *American Trucking Asso.* v. *United States* (11th Cir. 1982) 688 F.2d 1337, as authority for its assertion that Cellular Plus does not claim an injury that is compensable under the Cartwright Act. *Keogh* involved a claim by a shipper that railroad companies had fixed rates in violation of the Sherman Act. However, the United States Supreme Court noted all of the rates had been determined to be "reasonable and non-discriminatory" by the Interstate Commerce Commission (ICC), so it held the shipper could not recover damages for the benefit of rates which would have been lower but for the conspiracy. (260 U.S. at pp. 161-162 [67 L.Ed. at p. 187].)

The United States Supreme Court revisited this issue in *Square D Co.* v. *Niagara Frontier Tariff Bur.* (1986) 476 U.S. 409 [90 L.Ed.2d 413, 106 S.Ct. 1922]. In *Square D*, the court summarized the holding of *Keogh* as follows:

"*Keogh* simply held that an award of treble damages is not an available remedy for a private shipper claiming that the rate submitted to, and approved by, the ICC was the product of an antitrust violation." (*Square D Co.* v. *Niagara Frontier Tariff Bur.*, *supra*, 476 U.S. at p. 422 [90 L.Ed.2d at p. 425].) When asked to overrule the *Keogh* rule, the *Square D* court declined to change the rule because intervening legislation enacted by Congress in the antitrust and interstate commerce area presumably indicated Congress either adopted or did not want to change the *Keogh* holding and also because *Keogh* had been established law relied upon for over six decades. (*Square D Co.* v. *Niagara Frontier Tariff Bur.*, *supra*, 476 U.S. at p. 423 [90 L.Ed.2d at pp. 425-426].) The court essentially based its decision on stare decisis in that the *Keogh* decision had been relied upon as the law for over 60 years and on the fact Congress had enacted legislation in the area of antitrust law and interstate commerce during this period without changing the *Keogh* rule. Thus, even though the court assumed the *Keogh* decision "was unwise as a matter of policy" and there had been a number of developments since 1922 which undermined the reasoning of *Keogh*, the court found itself bound to follow *Keogh*. (*Square D Co.* v. *Niagara Frontier Tariff Bur.*, *supra*, 476 U.S. at pp. 420, 423-424 [90 L.Ed.2d at pp. 423, 425-426].)

We acknowledge there are strong similarities between the *Keogh* case and the alleged facts in this action. Both cases involve rates that were determined to be "reasonable" by a regulatory agency. Both cases involve claims that price fixing resulted in prices higher than they would have been under freely competitive conditions.

However, we find no compelling underlying logic or policy reasons for denying a Cartwright Act cause of action for treble damages to a person

injured by reason of a price fixing conspiracy, even if the fixed prices had been approved as reasonable by a regulatory agency. We also are not compelled to follow the *Keogh* and *Square D* rulings for a number of distinguishing factors. First, it is clear the Cartwright Act need not be interpreted as narrowly as the Sherman Act was under the *Keogh* and *Square D* decisions. ■■■ To the contrary, the California Supreme Court has stated that "the Cartwright Act is broader in range and deeper in reach than the Sherman Act . . . ." (*Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 920 [221 Cal.Rptr. 575, 710 P.2d 375].) ■■■ Second, the instant action pertains to the cellular telephone industry and the PUC's regulatory authority over providers of such service, whereas *Keogh* and *Square D* dealt with the ICC's regulatory authority over common carriers. Third, the *Keogh* court expressed doubts a lower rate would have benefited the shipper, whereas in this case we must presume Cellular Plus would have benefited by reason of lower cellular telephone service rates. Fourth, the *Keogh* court focused on whether the common carrier rates were illegal under the ICC statutes and regulations, whereas Cellular Plus does not argue the rates charged were not duly approved and legal under PUC regulations, but it focuses on the alleged wrongful acts in fixing prices. Fifth, *Keogh* dealt with a claim by a customer allegedly harmed by paying higher rates for transportation due to the price fixing agreement. In this case, Cellular Plus includes not only individual customers, but also corporate sales agents who do not claim they paid higher prices but only that they lost sales as a result of the alleged price fixing agreement. Sixth, it appears the PUC desires the cellular telephone service industry to be as freely competitive as possible, whereas the ICC in the *Keogh* and *Square D* cases appeared to be more concerned about price uniformity and nondiscrimination than competition. In its *Investigation on the Commission's own motion into the Regulation of Cellular Radiotelephone Utilities* (1990) Cal.P.U.C. Dec. No. 90-06-025 dated June 6, 1990, the PUC noted that its "decision reflects a basic philosophical direction to rely on competitive forces to set prices for cellular service . . . ." (*Id.* at p. 3.) Finally, as discussed above, the *Square D* decision was based primarily upon over 60 years of stare decisis since the *Keogh* decision and the fact Congress had not altered the *Keogh* rule during the entire period despite enacting legislation in the antitrust and interstate commerce area, such as the Reed-Bulwinkle Act enacted in 1948 which exempted from antitrust laws joint setting of rates by competitors pursuant to rate setting agreements approved by the ICC. PacTel and U.S. West fail to cite any California decision similar to *Keogh* which prohibits Cellular Plus from bringing a treble damages claim under the Cartwright Act or any actions by our Legislature which would evidence any intention that the Cartwright Act be interpreted in a like manner as the Sherman Act under *Keogh*. As a result, we decline to follow the *Keogh* and *Square D* decisions insofar as they would preclude Cellular

Plus from bringing a cause of action for price fixing under the Cartwright Act. We conclude the strong public policy of the Cartwright Act encouraging free and open competition and competitively established prices applies even to companies regulated by the PUC. If we were to deny Cellular Plus a cause of action merely because the PUC had approved the prices as "reasonable" while ignorant of the alleged price fixing agreement, we would implicitly be encouraging regulated companies to engage in anticompetitive price fixing activities by reason of denying plaintiffs the major private enforcement threat of treble damages under the Cartwright Act.

We do not ignore the jurisdiction of the PUC in determining the reasonableness of rates. However, at most, the fact of approval of rates by the regulatory agency should be a factor in determining the amount of damages awarded and not whether a cause of action exists at all under the Cartwright Act. We discuss in more detail below the consequences of the PUC's authority to approve rates of utilities. We decline to apply a *Keogh*-type rule to the price fixing claims of Cellular Plus in light of the strong public policy reasons for prohibiting price fixing conspiracies under the Cartwright Act. Accordingly, we hold Cellular Plus has alleged a compensable injury under the Cartwright Act.

*Issue 4: The Regulatory Authority of the PUC Does Not Preclude a Violation of the Cartwright Act*

PacTel and U.S. West apparently acknowledge and agree that the existence of PUC regulatory authority over rates does not immunize them from, or otherwise preclude a claim against them for, a violation of the Cartwright Act. Rather, it appears they argue that any such claim must first be brought before the PUC. We will discuss the latter argument below. (8a) However, in light of the trial court's statement in its ruling sustaining the demurrer to the third cause of action, we will address the issue of whether the PUC's regulatory authority precludes a violation of the Cartwright Act. Specifically, the court stated in its ruling: "They are the only companies authorized to provide cellular service in San Diego County, *thereby precluding a violation of the Cartwright Act.*" (Italics added.) To the extent the court ruled there could be no violation of the Cartwright Act because of the regulatory authority of the PUC, it is in error. Neither the Cartwright Act nor the Public Utilities Code contains any provision exempting cellular telephone service providers from the prohibitions of the Cartwright Act.

Price fixing under the Cartwright Act has been deemed a sufficiently egregious offense as to justify the application of an unlawful per se rule. As the California Supreme Court has stated:

"Certain violations of the antitrust laws are deemed to constitute an illegal restraint of trade as a matter of law. Among these are price fixing. . . .

"。 . . . . . . . . . . . . . . . . . . . . . . . .

"Nor is it significant that the prices set pursuant to a price-fixing scheme are reasonable, for the 'reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow.' [Citation.]

". . . . . . . . . . . . . . . . . . . . . .

"These rules apply whether the price-fixing scheme is horizontal or vertical; that is, whether the price is fixed among competitors [citation] or businesses at different economic levels [citation]. Defendants' claim that neither California law nor federal law prohibits price-fixing between non-competitors is clearly without merit." (*Mailand* v. *Burckle, supra*, 20 Cal.3d at pp. 376-377.) The same court had previously acknowledged that under "both California and federal law, agreements fixing or tampering with prices are illegal per se." (*Oakland-Alameda County Builders' Exchange* v. *F.P. Lathrop Constr. Co.* (1971) 4 Cal.3d 354, 363 [93 Cal.Rptr. 602, 482 P.2d 226].)

Price fixing between competitors is illegal per se under the Cartwright Act. ▮▮▮ There are no exceptions from this per se rule for price fixing agreements between two utilities, such as U.S. West and PacTel, whose rates are subject to approval by the PUC, nor do we see any public policy reasons for such an exception. Accordingly, we conclude the regulatory authority of the PUC does not preclude Cellular Plus from asserting a valid cause of action against U.S. West and PacTel for alleged wholesale and retail price fixing in violation of the Cartwright Act.

*Issue 5: The Price Fixing Claims Need Not Be Brought Initially Before the PUC*

▮▮▮ PacTel and U.S. West finally contend that any price fixing claims under the Cartwright Act against them must initially be brought before the PUC under the "primary jurisdiction" principle. Essentially, they argue the PUC has exclusive jurisdiction by statute to determine whether rates for cellular telephone service in California are reasonable, and the price fixing claims by Cellular Plus amount to no more than claims that the prices charged by U.S. West and PacTel are unreasonable. Although the PUC does have primary jurisdiction over the reasonableness of individual rates charged

by U.S. West and PacTel, we find no merit in their contention that price fixing claims alleging a conspiracy to artificially maintain uniformity between their rates must initially be brought before that body. To the contrary, we conclude Cellular Plus may bring its price fixing causes of action in the California courts without first resorting to the PUC.

Public Utilities Code section 2106 explicitly authorizes California courts to hear claims against public utilities for damages, and it also allows exemplary (i.e., punitive) damages in cases where the actions are willful. Presumably, the treble damages authorized by section 16750 for violations of the Cartwright Act would be included within this provision. Public Utilities Code section 2106 states in part:

"Any public utility which does . . . any act . . . declared unlawful, . . . shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was wilful, it may, in addition to the actual damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person." Thus, Public Utilities Code section 2106 clearly authorizes private actions against public utilities, such as PacTel and U.S. West, for damages or other injuries suffered by private persons, such as Cellular Plus, arising out of acts in violation of California laws, such as the Cartwright Act.

PacTel and U.S. West contend, however, that Public Utilities Code section 1759 prohibits Cellular Plus from pursuing its price fixing claims in the California courts until it first has presented its claims to the PUC. Public Utilities Code section 1759 states in part:

"No court of this State, except the Supreme Court to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission . . . or to enjoin, restrain, or interfere with the commission in the performance of its official duties . . . ." Although unclear, apparently they argue the instant action somehow contravenes an existing PUC order or decision. The only PUC decisions to which they even allude are *Application of PacTel Mobile Access* (1985) Cal.P.U.C. Dec. No. 85-04-023 dated April 3, 1985 and *Application of Gencom, Inc.* (1985) Cal.P.U.C. Dec. No. 85-12-023 dated December 4, 1985, in which the PUC determined the cellular telephone service rates of PacTel and U.S.

West (successor to Gencom) were reasonable.[5] Under the Cartwright Act, a court does not look at the economic reasonableness of the prices. Rather, a court looks at whether the prices were in fact artificially maintained at a uniform level, whether "reasonable" or not.

 In addition, PacTel and U.S. West also contend the broad jurisdictional scope of Public Utilities Code section 1759 bars this proceeding for another reason. They assert the trial court's proceedings in this action would interfere with the PUC's overall primary jurisdiction as to rates charged by public utilities. We conclude this is an overbroad reading of Public Utilities Code section 1759.

California courts have recognized Public Utilities Code section 2106 vests and empowers the state courts with jurisdiction to award both compensatory and exemplary damages against public utilities for injuries resulting from any unlawful act. (*Stepak* v. *American Tel. & Tel. Co.* (1986) 186 Cal.App.3d 633, 640 [231 Cal.Rptr. 37]; *Masonite Corp.* v. *Pacific Gas & Electric Co.* (1976) 65 Cal.App.3d 1, 7 [135 Cal.Rptr. 170].) The California Supreme Court acknowledged the apparent conflict between Public Utilities Code sections 2106 and 1759, and it resolved the conflict by stating the following general rule:

"[I]n order to resolve the potential conflict between sections 1759 and 2106, the latter section must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies." (*Waters* v. *Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4 [114 Cal.Rptr. 753, 523 P.2d 1161].)

 We cannot conceive how a price fixing claim under the Cartwright Act could "hinder or frustrate" the PUC's supervisory or regulatory policies. The only apparent policy of the PUC that could be affected is its regulation of rates charged by cellular telephone service providers. However, Cellular Plus does not dispute that the PUC has jurisdiction over rates, nor does it seek any relief requiring the PUC to change any rates it has approved. Cellular Plus is merely seeking treble damages and injunctive relief for alleged price fixing under the Cartwright Act.

PacTel and U.S. West cite a recent California case as support for their proposition that the trial court does not have primary jurisdiction over the claims by Cellular Plus. In *Schell* v. *Southern Cal. Edison Co.* (1988) 204 Cal.App.3d 1039, 1046 [251 Cal.Rptr. 667], the court stated:

[5]PacTel and U.S. West present no PUC decisions after 1985 in which their rates have been ruled "reasonable."

"[T]he superior court is precluded from deciding issues which must necessarily be decided by the PUC in its continuing exercise of jurisdiction over rate making, rate regulation, and similar issues." The court concluded that the particular action before it regarding applicable electric rates was not only within the exclusive jurisdiction of the PUC, but the issues were also currently pending before the PUC in three cases. As a result, it upheld the dismissal of the actions in the superior court. The *Schell* case is clearly inapposite. In *Schell* the claim was essentially that the wrong rate schedule for electrical service was applied by the public utility. No antitrust claim under the Cartwright Act was involved and those claims are not "necessarily" to be decided by the PUC. Our Supreme Court confirmed the PUC does not have jurisdiction over antitrust violations when it repeated the following observations of Judge J. Skelly Wright:

" '[I]t is clear that antitrust concepts are intimately involved in a determination of what action is in the public interest, and therefore the Commission is obliged to weigh antitrust policy.' . . . '*This is not to suggest, however, that regulatory agencies have jurisdiction to determine violations of the antitrust laws.* [Citations.] Nor are the agencies strictly bound by the dictates of these laws, for they can and do approve actions which violate antitrust policies where other economic, social and political considerations are found to be of overriding importance.' " (*Northern California Power Agency* v. *Public Util. Com.* (1971) 5 Cal.3d 370, 377 [96 Cal.Rptr. 18, 486 P.2d 1218], italics added, quoting *Northern Natural Gas Co.* v. *Federal Power Com'n* (D.C. Cir. 1968) 399 F.2d 953, 958, 960-961 [130 U.S.App.D.C. 220].) The court noted that the PUC's "consideration of antitrust problems is for purposes quite different from those of the courts; it does not usurp their function." (*Northern California Power Agency* v. *Public Util. Com.*, *supra*, 5 Cal.3d at p. 378.) Accordingly, it is clear that the courts have primary, if not exclusive, jurisdiction over antitrust causes of action. The interest of the PUC in antitrust matters appears to be merely as one of the factors to be considered in making its rate determinations and other regulatory decisions within its authority. Clearly, the PUC has no authority to hear and adjudge all causes of action against public utilities under the Cartwright Act. Such causes of action are within the jurisdiction of the courts. Accordingly, we conclude the price fixing claims of Cellular Plus are properly before the trial court.

At our request, the parties submitted supplemental briefs on the issue of primary jurisdiction discussed in *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377 [6 Cal.Rptr.2d 487 [826 P.2d 730]. In *Farmers*, the California Supreme Court concluded the primary jurisdiction doctrine applied to an unfair business practices claim that an insurer essentially failed to

offer a "Good Driver Discount Policy" to all eligible applicants. (*Id.* at p. 401.) Accordingly, the court held the claim must be stayed pending administrative proceedings before the Insurance Commissioner. (*Id.* at p. 401.) The court noted the primary jurisdiction doctrine furthers two policies. First, it "enhances court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise," and, second, it "helps assure uniform application of regulatory laws." (*Id.* at p. 391.) The court concluded the factfinding expertise of the insurance commissioner required application of the doctrine, since the gravamen of the claim was actually violation of provisions of Insurance Code sections 1861.02 and 1861.05 and applicable regulations adopted by the insurance commissioner. (*Farmers Ins. Exchange* v. *Superior Court, supra,* 2 Cal.4th at pp. 398-399.)

PacTel and U.S. West contend the *Farmers* holding controls the outcome of this case and requires application of the primary jurisdiction doctrine. However, we conclude the case is inapposite. In *Farmers*, the particular claim required an interpretation and application of statutes and regulations within the expertise of the insurance commissioner. (2 Cal.4th at p. 398.) Further, uniform application of the statutes and regulations was desirable. (*Id.* at p. 400.) As a result, the insurance commissioner was in the best position to interpret the statutes and its own regulations and to assure uniform application of them. In contrast, antitrust price fixing claims do not require interpretation of any law or issue within the PUC's expertise or for which the PUC could assure uniform application. As Cellular Plus correctly alleges, its claim involves no section of the Public Utilities Code. Rather, it alleges a violation of the Cartwright Act, namely price fixing, which the courts, and not the PUC, are accustomed to interpreting and making the necessary factual determinations. The "reasonableness of rates," which the PUC is accustomed to deciding, is *not* the crux of the complaint. Accordingly, the primary jurisdiction doctrine, as discussed and applied in the *Farmers* case, is not applicable here.

In a federal antitrust case involving claims against a common carrier regulated by the PUC, a federal court discussed the issue of primary jurisdiction and whether the PUC should first consider the claims made by the plaintiff regarding monopolization. (*Marnell* v. *United Parcel Service of America, Inc.* (N.D.Cal. 1966) 260 F.Supp. 391, 410-414.) The court observed that the primary jurisdiction doctrine:

"[I]s mainly intended to apply to cases in which the Court has jurisdiction to grant a remedy upon proof of the facts alleged before it, but the issues are

such as also fall within the special competence—the 'expertise'—of an administrative agency in some field wherein uniformity of statute policy or interpretation is desirable. In such cases the doctrine of primary jurisdiction requires that the Court should stay its proceedings pending a referral of the issues to the agency out of consideration for the agency's 'primary' (but not exclusive) jurisdiction over the issues." (*Id.* at p. 413.) The court in *Marnell* concluded that in the monopolization claim before it the doctrine of primary jurisdiction did not apply. It reasoned that:

"[R]eferral of the issue as requested by defendants for an agency determination would not materially assist the Court in disposing of this case. *The cost, time and effort of such a referral would seriously attenuate the purpose of the antitrust laws under which this suit is brought.*" (*Id.* at p. 414, italics added.) We find the reasoning of the *Marnell* court to be compelling and directly applicable to the case at hand. Claims under the Cartwright Act are clearly within the province of the courts, not the PUC. Courts are accustomed to hearing and deciding claims under the Cartwright Act. The PUC's only interest in the instant action would appear to be in the rates applicable to cellular telephone service and the reasonableness of those rates. Such limited interest is minor in comparison to the strong public policy against price fixing evidenced by the Cartwright Act, for which the courts have always been the appropriate forum for complaints. The PUC does not have primary jurisdiction of the price fixing claims by Cellular Plus.

 PacTel and U.S. West also contend that an award of treble damages pursuant to section 16750 would result in an illegal rate refund violating Public Utilities Code section 532 or an illegal rate discrimination violating Public Utilities Code section 453, subdivision (a). We conclude that the bringing of this action should not necessarily result in violations of these sections, although the trial court should be cognizant of these provisions and attempt to structure any relief so as not to violate them.

Cellular Plus asks for treble damages as one of the remedies for the injuries it suffered as a result of the alleged price fixing. Treble damages in this respect do not constitute a rate adjustment which would give Cellular Plus a favorably lower rate than others. To the contrary, punitive damages are not an item of compensatory damages and, thus, cannot be construed as an "adjustment" of customer rates under the Public Utilities Code. Further, as to the corporate plaintiffs, Cellular Plus is not making a claim as a customer or user of cellular telephone service. Rather, in this respect its

claim is as a sales agent for U.S. West for lost sales (presumably resulting in lost commissions) as a result of rates that were too high because of the alleged price fixing agreement. An award of punitive damages to Cellular Plus would not result in any rate difference among the customers of PacTel and U.S. West. Further, as to the corporate plaintiffs, even the measure of damages which would be tripled under the Cartwright Act is not directly based upon the rate difference resulting from the alleged price fixing agreement. Rather, such damages presumably will be shown to be the lost profits the corporate plaintiffs suffered as a result of the alleged price fixing of cellular service rates. This case is not unlike that of *Empire West* v. *Southern California Gas Co.* (1974) 12 Cal.3d 805 [117 Cal.Rptr. 423, 528 P.2d 31, A.L.R.4th 2713], wherein the California Supreme Court held recovery of actual damages incurred as a result of an alleged fraud by a public utility could not possibly constitute an unlawful refund or rebate under Public Utilities Code section 532. (*Empire West* v. *Southern California Gas Co.*, *supra*, 12 Cal.3d 805 at pp. 811-812.) Accordingly, we conclude the relief prayed for by Cellular Plus will not result in any illegal rate rebates under Public Utilities Code section 532.

Similarly, we conclude there can be no rate discrimination under Public Utilities Code section 453 by virtue of the same reasoning. As to the corporate plaintiffs, Cellular Plus is not claiming lower rates for itself as a customer. Rather, it asks for lost profits as a sales agent of U.S. West resulting from the wrongfully high prices charged due to the alleged price fixing agreement. Further, as to the individual plaintiffs, Cellular Plus seeks compensatory damages in the amount and to the extent the fixed prices were excessive. Such damages are not any different from what damages any other customer of U.S. West or PacTel may be entitled to, and Cellular Plus should not be precluded from seeking compensatory damages merely because other customers do not similarly enforce their rights to damages. Accordingly, we conclude this action will not result in any prohibited rate discrimination under the Public Utilities Code.

## DISPOSITION

Let a writ issue directing the superior court to vacate that portion of its order granting the motion for demurrer as to the third and twenty-second causes of action and enter a new order denying the same, and further directing the court to try first the issue of liability. We further instruct the court to consider, before trying the issue of damages, whether and at what point it is necessary to obtain a PUC determination whether it would have

approved lower rates for U.S. West and PacTel during the periods in question.

Todd, J., and Huffman, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied July 1, 1993. Lucas, C. J., and Panelli, J., did not participate therein.