COUNTY OF STANISLAUS, a Public Entity; Mary Grogan; Ron Demirdjian, Plaintiffs–Appellants,

v.

PACIFIC GAS AND ELECTRIC COMPANY, a California Corporation; Pacific Gas Transmission Company, a wholly owned subsidiary of Pacific Gas & Electric Company, Defendants–Appellees.

No. 96–15275.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 1997.

Decided May 29, 1997.

Frank C. Damrell, Jr. and Lisa L. Gillispie, Damrell, Nelson, Schrimp, Pallios & Ladine, Modesto, California, together with Bruce L. Simon, Cotchett & Pitre, Burlingame, California, and Tony J. Tanke, Tanke & Willemsen, Belmont, California, for the plaintiffs-appellants.

Marie L. Fiala and M. Laurence Popofsky, Heller, Ehrman, White & McAuliffe, San Francisco, California, for the defendants-appellees.

Before: BRUNETTI, FERNANDEZ, and HAWKINS, Circuit Judges.

## OPINION

HAWKINS, Circuit Judge:

The issues in this appeal are at the intersection of federal regulation of interstate commerce and the antitrust laws. We are asked to determine what interest must yield when federal regulatory review leads to allegedly anticompetitive behavior: specifically, whether federal review of natural gas importation, transportation, and sales precludes antitrust claims for behavior underlying or leading to the regulatory result. We hold that it does and therefore affirm the district court's dismissal of plaintiffs' claims.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiffs-appellants in this class action are individuals and entities who received natural gas ("gas") service from defendant Pacific Gas & Electric Company ("PG & E") from February 1988 through October 1993. Within the plaintiff class are two types of gas customers: core customers and non-core customers. Core customers, according to plaintiffs' complaint, "are residential and commercial customers without alternate fuel capability." Plaintiff Mary Grogan is the class representative for the core customers. Non-core customers, by contrast, are large commercial and industrial consumers that are capable of purchasing gas from alternative sources. The County of Stanislaus ("County") is a non-core customer.

Defendant-appellee PG & E is a public utility company that supplies natural gas to millions of commercial and residential customers in northern and central California. Defendant-appellee Pacific Gas Transmission Company ("PGT") is a wholly-owned subsidiary of PG & E. PGT owns and operates a gas pipeline that extends from the Canada–United States border to California. Defendant-appellee Alberta & Southern Gas Company ("A & S"), a Canadian corporation, also is a wholly-owned subsidiary of PG & E. A & S is an aggregator and exporter of Canadian gas.

During the time period relevant to this lawsuit, defendant A & S negotiated contracts with a group of natural gas producers from Alberta, Canada, for the sale of gas to PG & E. Plaintiffs allege that the Alberta producers acted as a cartel, and that A & S and the cartel conspired to increase the price paid for gas above the prevailing market rate for Canadian gas.[1]

At the United States border, A & S sold the gas to defendant PGT, which owned the pipeline that transported the gas to California. At the California border, PGT sold the gas to PG & E. In addition to the price-fixing conspiracy, plaintiffs contend that defendants prevented PG & E's competitors from gaining necessary access to PGT's pipeline. Plaintiffs allege that PG & E purchased excessive quantities of cartel gas in order to "stuff" the pipeline and prevent competitors from supplying gas to non-core customers in California. Plaintiffs further allege that PG & E caused its Utility Electric Generation Department ("UEG") to elect core service, which effectively filled the pipeline and foreclosed access for non-core customers.

Plaintiffs assert the following claims for relief: (1) price fixing in violation of section 1 of the Sherman Act, the Wilson Tariff Act, section 3 of the Clayton Act, and California's Cartwright Act; and (2) denial of pipeline access in violation of the Sherman Act, the Wilson Tariff Act, the Clayton Act, and California's Cartwright Act.[2]

Several levels of federal and state review scrutinized the gas purchase and transportation process described above. After review by Canadian agencies, the agreement for the import of gas from Alberta was subject to United States agency review. Two federal agencies regulate natural gas imports and

---

1. A & S based the price it paid for gas on a "netback" formula, which arrives at a price by subtracting the cost of transportation from Alberta to California from the price of gas produced in the southwestern United States and transported to California. This is one of only two methods of price calculation that the Canadian regulatory structure permits. The other permissible method of price calculation requires the parties to submit to arbitration.

2. The remaining claims—claims for injunctive relief—became moot when the contracts expired in October 1993 and are not before us on this appeal.

sales: the Economic Regulatory Administration ("ERA") and the Federal Energy Regulatory Commission ("FERC").

Under section 3 of the Natural Gas Act ("NGA"), ERA reviews foreign natural gas imports and must approve a proposed importation of natural gas unless the import "will not be consistent with the public interest." 15 U.S.C. § 717b(a). ERA considers the competitiveness of the imported gas, the need for the gas, and the security of the gas supply. Pursuant to Department of Energy policy, the "primary consideration" is the "competitiveness of an import arrangement in the market served." *Pacific Gas Transmission Co.* [*PGT II* ], 1 E.R.A. ¶ 70,591 at 72,386 (1985). In a series of orders, ERA first granted conditional, then final approval to the proposed sale and importation from A & S to PGT. *See id.; Pacific Gas Transmission Co.* [*PGT I* ], 1 E.R.A. ¶ 70,574 at 72,321 (1984). ERA found that "PGT's import arrangement is competitive and market responsive, and can be expected to remain so over the term of the underlying contract." *PGT II* at 72,386.

In addition to ERA review, sections 4(c) and (d) of the NGA require sellers of natural gas in interstate commerce to file their rates with FERC. 15 U.S.C. §§ 717c(c), (d). In this case, FERC reviewed the price that PG & E paid to PGT for the gas to ensure that the price was "just and reasonable." 15 U.S.C. § 717c(a). Though FERC may not redetermine the reasonableness or competitiveness of an import arrangement approved by ERA, it must independently ensure that Canadian and domestic sources of gas receive equal treatment. *See TransCanada Pipelines Ltd. v. FERC,* 878 F.2d 401, 407, 411 (D.C.Cir.1989).

Moreover, FERC administers several programs that provide transportation rights on PGT's pipeline to non-core customers. For example, pipeline operators such as PGT could apply to FERC for an individual certificate of public convenience and necessity to transport natural gas on behalf of a non-core customer. *See* 15 U.S.C. § 717f. Though the certificates received only limited use because of the administrative burden they imposed, PGT did obtain certificates for at least nine shippers during the 1980s. *Re Pacific Gas Trans. Co.,* 40 F.E.R.C. ¶ 61,193 at 61,-622 n. 29 (1987). The County does not allege that it ever sought access to PGT's pipeline pursuant to this program.

In 1985, FERC adopted the "blanket certificate" program, intended to provide customers with greater access to gas transportation. *See* 50 Fed.Reg. 42408 (1985). The program authorized interstate pipelines to transport gas in competition with their own gas on a first-come, first-served basis. *See* 18 C.F.R. §§ 284.1–284.9, 284.221—284.227. PGT employed a lottery system to offer access under the blanket certificate program and received bids from customers for transportation access far exceeding available pipeline capacity. The County does not allege participation in the lottery, nor does it allege impropriety by PGT in conducting the lottery.

Non-core customers may also seek access through a program known as the "Section 311" shipper queue. *See* 15 U.S.C. § 3371(a). Under this program, interstate pipeline operators can transport gas for certain customers by submitting tariffs to FERC for approval. Although PGT received approval in 1987 to act as a section 311 shipper, the County does not allege that it sought access to this program.

In addition to federal regulation, a California state agency regulates the rates that utilities charge within the state. The California Public Utilities Commission ("CPUC") retrospectively reviews rates and the costs underlying those rates to ensure that the rates are "just and reasonable." Cal.Pub. Util.Code § 451. The core/non-core distinction results from a 1986 CPUC program designed to ensure a consistent supply of gas for the core customers while allowing some purchasing flexibility to non-core customers. *See Re New Regulatory Framework for Gas Utilities,* 22 C.P.U.C.2d 491, 505, 1986 WL 215056 (1986). As part of the program, non-core customers could elect core service and be treated as core customers. *Id.* at 520–21.

Many PG & E customers chose to core-elect. In addition, PG & E elected core service for its UEG. As a result of the core-

election program, non-core customers suffered a reduction in transportation capacity. In response to their complaints, however, CPUC determined that core election benefitted core and non-core customers by increasing PG & E's bargaining power with Canadian producers. *Re Natural Gas Procurement and System Reliability,* 30 C.P.U.C.2d 545, 558–60, 1988 WL 391270 (1988). Thus, CPUC endorsed a PG & E strategy to maximize core-election by its non-core customers.

CPUC nonetheless implemented several programs designed to ensure transmission capacity for non-core customers. In 1990, CPUC required PG & E to allocate a portion of its pipeline rights to non-core customers. In 1991, CPUC adopted a program that required PG & E to make available to non-core customers any transportation capacity in excess of that required to serve core customers. The County, a non-core customer, does not allege that it sought to take advantage of either of these programs.

■ After plaintiffs filed their initial complaint in this matter, defendants filed a Rule 12(b)(6) motion to dismiss, which the district court granted in part and denied in part. The district court granted plaintiffs leave to amend the complaint. Plaintiffs filed an amended complaint, which added A & S as a defendant. The district court granted defendants' renewed motion to dismiss on a number of grounds without leave to amend. We review plaintiffs' timely appeal de novo. *Oscar v. University Students Co-op. Ass'n,* 965 F.2d 783, 785 (9th Cir.1992) (en banc).

## ANALYSIS

The district court, in ruling on defendants' motions to dismiss, held that the filed rate doctrine barred all of plaintiffs' claims for damages.

Since the 1920s, the "filed rate" or "filed tariff" doctrine has barred antitrust recovery by parties claiming injury from the payment of a filed rate for goods or services. *Keogh v. Chicago Northwestern Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). The doctrine has been the target of criticism since its inception. Recently, the Supreme Court acknowledged criticism of the doctrine, but affirmed its vitality as a "rule [that] has been an established guidepost at the intersection of the antitrust and interstate commerce statutory regimes for some 6 1/2 decades." *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 423, 106 S.Ct. 1922, 1930, 90 L.Ed.2d 413 (1986).

In *Keogh,* a private shipper claimed that rates submitted to and approved by the Interstate Commerce Commission ("ICC") pursuant to the Interstate Commerce Act had been fixed by a conspiracy that violated the Sherman Act. The shipper alleged that, as a result of the conspiracy, the rates were "higher than the rates would have been, if competition had not been thus eliminated." *Keogh,* 260 U.S. at 160, 43 S.Ct. at 48. The Supreme Court rejected the shipper's claim, agreeing with defendants that ICC approval of their rates conclusively established the rates as "reasonable and nondiscriminatory." *Id.* at 161, 43 S.Ct. at 49.

■ *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), applied the filed rate doctrine to rates filed with the Federal Power Commission (FERC's predecessor) and rejected a claim that defendant's allegedly fraudulent conduct had led to illegal and unreasonably high rates. *See id.* at 251–52, 71 S.Ct. at 695. The Court held that:

the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one.

*Id.; see also Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 962–63, 106 S.Ct. 2349, 2355, 90 L.Ed.2d 943 (1986) (describing *Montana–Dakota* ). We apply the filed rate doctrine out of deference to a "congressional scheme of uniform … regulation." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 579, 101 S.Ct. 2925, 2931, 69 L.Ed.2d 856 (1981) Otherwise, we would impermissibly "usurp[ ] a function that Congress has assigned to a federal regulatory body." *Id.* at 582, 101 S.Ct. at 2932; *see also Mississippi Power & Light v. Mississippi ex rel. Moore,*

487 U.S. 354, 371, 108 S.Ct. 2428, 2438, 101 L.Ed.2d 322 (1988); *Nantahala,* 476 U.S. at 964, 106 S.Ct. at 2355–56.

■ The filed rate doctrine applies both to federal antitrust actions and to state law causes of action relating to rates established by federal agencies. *See Arkansas Louisiana Gas,* 453 U.S. at 580, 101 S.Ct. at 2931–32. To permit recovery under state law would allow a state court (or a federal court applying state law) to undermine the authority of a federal agency, *id.* at 582, 101 S.Ct. at 2932–33, and would impermissibly contravene the Supremacy Clause. *See id.*

Here, the sale and transportation of natural gas from Canada to California cleared several levels of state and federal review: FERC reviewed the price that PG & E paid to PGT for the gas; ERA reviewed the import contract between A & S and PGT; and CPUC reviewed the retail prices that PG & E charged to its California customers. For purposes of the filed rate doctrine, the two levels of federal review are sufficient to bar the claims—state and federal—that plaintiffs press in this action.

Plaintiffs assert three types of antitrust claims: price fixing, "market preclusion" or denial of access, and state antitrust claims. We conclude that the filed rate doctrine bars all claims in this case, and we address each type of claim separately.

## A. Federal Price Fixing Claims

■ Plaintiffs claim that defendants' FERC-approved rates were the product of antitrust violations, and seek as damages the "overcharge" that resulted from the fixed prices. This is precisely what the filed rate doctrine prohibits. As we recognized in *Cost Management Servs. v. Washington Natural Gas Co.,* 99 F.3d 937 (9th Cir.1996), a claim for damages based on a filed rate would be too speculative, because it:

> would require a showing that a hypothetical lower rate should and would have been adopted by [FERC]. Whether or not the agency would have actually approved a

different rate was a question best left to the agency itself, rather than the courts. 99 F.3d at 944.

■ Plaintiffs' complaint, which seeks treble damages on the ground that alleged antitrust activities caused plaintiffs to pay an inflated rate for their gas, asks for that which *Keogh* and its progeny will not allow; "an award of treble damages is not an available remedy for a [plaintiff] claiming that the rate submitted to, and approved by, [FERC] was the product of an antitrust violation." *Square D,* 476 U.S. at 422, 106 S.Ct. at 1929; *see also H.J. Inc. v. Northwestern Bell Telephone Co.,* 954 F.2d 485, 488 (8th Cir.1992) ("The filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue.").

■ Plaintiffs cannot meaningfully distinguish *Square D,* which concerned a Canadian conspiracy to fix rates for freight transportation occurring outside the purview of the ICC. *Square D,* 476 U.S. at 414, 106 S.Ct. at 1925. Plaintiffs in the instant case have characterized the activities of A & S and the alleged cartel as "beyond the U.S. border" and "outside the authority of domestic regulatory agencies." *Square D* rejected such a "narrow reading" of the filed rate doctrine, *id.* at 417 n. 19, 106 S.Ct. at 1927 n. 19, adhering to *Keogh's* rule that antitrust damages are not available for claims based on filed rates. *See id.* at 422, 106 S.Ct. at 1929–30. The same result obtains here: the filed rate doctrine precludes antitrust claims seeking damages on the basis of filed rates.

## B. Federal "Market Preclusion" Claims

■ The filed rate doctrine also bars plaintiffs' claims that defendants' gas purchasing agreements operated to deny plaintiffs access to the PGT pipeline, such that plaintiffs could not independently arrange to procure less expensive gas. Plaintiffs' denial of access claims are, at core, a challenge to the quantity of gas that PG & E purchased from Canadian producers; because such quantities had received ERA approval and authorization, the claims cannot overcome the filed rate doctrine's clear instruction that

ERA-approved volumes are conclusively reasonable.

Application of the filed rate doctrine to ERA review is a matter of first impression. This case requires us to address a claim that the defendants' import practices—which had received ERA review and approval—detrimentally affected plaintiffs' ability to obtain less expensive natural gas. Guided by Supreme Court precedent, the complimentary jurisdiction of ERA and FERC, and the Supremacy Clause, we hold that ERA approval establishes an import volume as conclusively reasonable and thereby forecloses any challenge to importation volumes. As a result, plaintiffs in this litigation cannot complain that PG & E and PGT illegally "stuffed" their pipeline with cartel gas; ERA approval of those volumes of gas precludes any such complaint.

In *Nantahala*, the Supreme Court applied the filed rate doctrine to a FERC-ordered allocation of power and concluded that "the filed rate doctrine is not limited to 'rates' *per se*." 476 U.S. at 966, 106 S.Ct. at 2357. *Nantahala* involved a decision of the North Carolina Supreme Court, which had affirmed an allocation of power by North Carolina's Utility Commission ("NCUC") that differed from a prior FERC allocation. The *Nantahala* Court held, on the basis of the filed rate doctrine, that FERC's ordered allocation preempted a subsequent reallocation by NCUC. *Id.* at 972–73, 106 S.Ct. at 2360. According to the Supreme Court,

> The North Carolina court's ruling that Nantahala had purchased an unreasonably large quantity of high-cost power ... conflicts with FERC's orders in the same manner as would a refusal to recognize a FERC-approved price as a reasonable cost for purposes of retail ratemaking.

*Id.* at 973, 106 S.Ct. at 2360.

Just as the North Carolina court in *Nantahala* was powerless to reject FERC's allo-

cation, we cannot allow plaintiffs' claims to proceed given ERA's authorization of PGT's import volumes as "just and reasonable."

Although plaintiffs correctly note that the Supreme Court in *Nantahala* left open the possibility that a claim concerning the quantity of power purchased might survive the filed rate doctrine,[3] plaintiffs' claims do not fall within this narrow question. The question not answered in *Nantahala* concerned *rates* filed with *FERC*, whereas this case concerns *volumes* filed with *ERA*. The difference is critical, and fatal to plaintiffs' denial of access claims: because the volumes in the instant case had received ERA approval, they—like the filed rates in *Keogh*—are *conclusively reasonable*, and not subject to the challenge that plaintiffs raise. *See Montana–Dakota*, 341 U.S. at 251–52, 71 S.Ct. at 695–96 (right to reasonable rate nothing more than the right to filed rate). *Nantahala* concerned action by FERC only; here, because, along with FERC price approval, PG & E filed the particular quantity purchased with ERA, the quantity was conclusively reasonable, and the *Nantahala* exception is not applicable.

Plaintiffs invoke a legion of cases in an attempt to bring their claims outside the filed rate doctrine, none of which has particular relevance here. Plaintiffs' reliance on *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144 (3rd Cir.1993) is misplaced. In *Lower Lake Erie*, steel companies, trucking companies, and dock companies filed suit against railroad companies, alleging that the railroads "conspired ... to preclude potential competitors from entering the market of lake transport, dock handling, storage and land transport of iron ore." *Id.* at 1151. At issue in *Lower Lake Erie* was "whether the railroads' rate-making activity occurred within the legal framework of the [Interstate Commerce Act]." *Id.* at 1152. The district court in *Lower Lake Erie* dismissed, on the basis of the filed rate doc-

---

**3.** The Supreme Court in *Nantahala* did not entirely foreclose the possibility of a claim based on allocation:

> Without deciding this issue, we may assume that a particular *quantity* of power procured by a utility from a particular source could be deemed unreasonably excessive if lower cost

power is available elsewhere, even though the higher cost power actually purchased is obtained at a FERC-approved, and therefore reasonable, *price*.

476 U.S. at 972, 106 S.Ct. at 2360 (emphasis in original).

trine, the steel companies' claims "based on the allegation that, absent the conspiracy, these plaintiffs would have paid lower rates for costs associated with the transportation of ore." *Id.* at 1154.

The claims that survived dismissal in *Lower Lake Erie* have no relevance here. In that case, if the anticompetitive conduct had not occurred, an entirely new alternative—shipping by truck as opposed to rail—would have been available to the steel companies. The railroads' rates were only coincidentally implicated because "the steel companies were compelled to continue to pay the railroad fixed rates." *Id.* at 1160. In the instant case, by contrast, no matter what the reality of the alleged anticompetitive behavior, plaintiffs here would still be paying PG & E's rates. That those rates could theoretically be lower is precisely what compels application of the filed rate doctrine. *Lower Lake Erie* simply is not relevant.

Similarly unhelpful to plaintiffs are *Cellular Plus, Inc. v. Superior Court*, 14 Cal. App.4th 1224, 18 Cal.Rptr.2d 308 (1993), and *Clipper Exxpress v. Rocky Mountain Motor Tariff*, 690 F.2d 1240 (9th Cir.1982). As explained in greater detail below, *Cellular Plus* concerns only state law causes of action and only those situations where no federal agency has exercised review. *See* 14 Cal. App.4th at 1240–43, 18 Cal.Rptr.2d 308. Because two federal agencies exercised regulatory authority in the instant case, *Cellular Plus* has no relevance, particularly to this federal cause of action.

*Clipper Exxpress* likewise involved a set of facts that renders it irrelevant to our present inquiry. The plaintiff in *Clipper Exxpress* sought damages based on allegedly anticompetitive activities of defendants that, for two years, prevented plaintiff from filing a proposed rate with the ICC. 690 F.2d at 1246. Two principal facts guided our decision not to apply the filed rate doctrine in *Clipper Exxpress:* (1) the rate, because known and ultimately approved, would not require a court to speculate as to damages; and, (2) the plaintiff had no remedy before the ICC. *Id.* at 1266–67. That simply is not the case here.

In the instant case, the only known rates are those that defendants filed with FERC,

ERA, and CPUC. To determine the damages that plaintiffs seek would require us to engage in the speculation that *Keogh* and its progeny forbid. In addition, plaintiffs here sought to challenge defendants' rates before state and federal agencies; that they received unsatisfactory results does not permit a court to step in and fashion its own remedy. The markedly different facts in *Clipper Exxpress* produced, appropriately, a markedly different result.

Finally, the three recent Ninth Circuit cases that plaintiffs contend have narrowed the filed rate doctrine have not done so in a manner helpful to their claims. *See Central Office Telephone, Inc. v. AT & T,* 108 F.3d 981 (9th Cir.1997); *Columbia Steel Casting Co. v. Portland General Elec. Co.,* 103 F.3d 1446 (9th Cir.1996), as amended on denial of rehearing, 111 F.3d 1427 (9th Cir.1997); *Cost Management Servs.,* 99 F.3d at 937.

*Central Office Telephone* involved a contract dispute. *See* 108 F.3d at 987–89. Defendant AT & T made promises that plaintiff claimed were not kept. We refused to apply the filed rate doctrine because "this case does not involve rates or rate setting." 108 F.3d at 990. By contrast, the instant case *only* involves rates and rate setting, and requires that we apply the filed rate doctrine.

The unique facts of *Columbia Steel* prompted us to reject the defendant's attempt to invoke the filed rate doctrine. *See* 103 F.3d at 1465. An agreement between two electric utilities divided the city into exclusive service territories. The plaintiff steel company was a customer of one utility, Portland General Electric, and was thwarted in its efforts to receive power from the other utility, Portland Power and Light. *Id.* at 1454. We refused to apply the filed rate doctrine because the case did not present a situation of hypothetical rate speculation. As we noted in *Columbia Steel,*

> The conduct challenged in this case is *not* [Portland General's] refusal to sell electricity to Columbia Steel at a lower rate. Rather, the challenged conduct is the *non-competition agreement* that prevented Columbia Steel from buying electricity at [Portland Power's] lower rates.

*Id.* at 1465 (emphasis added). We cannot say the same for the conduct alleged here, which amounts to little more than a refusal to sell gas to plaintiffs at a lower rate.

Lastly, *Cost Management Services* does not rescue plaintiffs' claims. *Cost Management Services* involved application of the "competitor exception" to the filed rate doctrine, an exception not helpful to any plaintiffs to the present action. *See* 99 F.3d at 945. The competitor exception does not aid the County or other non-core customers, who, though they might have competed with PG & E to purchase gas, did not take advantage of any of the programs for alternative access that FERC and CPUC offered. By failing to seek such alternative access, non-core customers paid the same filed rates for gas as core customers paid and cannot claim injury from exclusionary conduct unrelated to these filed rates.

Our conclusion that the filed rate doctrine bars plaintiffs' denial of access claim receives additional support from plaintiffs' complaint, which seeks as relief damages based on the difference between the rate paid for gas—a filed rate—and the rate potentially available from other Canadian producers. In reality, though framed as a challenge to access, this claim, too, is little more than a challenge to rates that FERC approved and filed for gas that PG & E imported, especially in light of plaintiffs' failure to seek access to alternative suppliers of gas. The filed rate doctrine bars the denial of access claims.

## C.  State Law Claims

■■■  As noted above, the filed rate doctrine bars *all* claims—state and federal—that attempt to challenge a rate that a federal agency has reviewed and filed. In the instant case, FERC determined that PG & E's wholesale prices were "just and reasonable," and ERA established that PGT's proposed import volumes were "in the public interest." Accordingly, plaintiffs can challenge neither the price of the gas nor the volume of gas procured. It makes no difference that plaintiffs choose to bring some of their claims under state law; on the facts of this case, the filed rate doctrine acts to bar all the challenges that plaintiffs assert. *See Arkansas Louisiana Gas,* 453 U.S. at 580, 101 S.Ct. at 2931–32; *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 326, 101 S.Ct. 1124, 1134–35, 67 L.Ed.2d 258 (1981). The district court properly dismissed the state law claims as barred by the filed rate doctrine.

Nor does *Cellular Plus* salvage plaintiffs' state law claims. *Cellular Plus* distinguished *Keogh* and *Square D,* holding that California's Cartwright Act "need not be interpreted as narrowly as the Sherman Act." 14 Cal.App.4th at 1241, 18 Cal.Rptr.2d 308. *Cellular Plus* concerned cellular telephone rates in California and involved no federal agencies and no federally filed rates. *Cellular Plus* merely declined to create a state filed rate doctrine where rates filed with the CPUC were not subject to federal review. *See, e.g., id.* at 1242, 18 Cal.Rptr.2d 308 ("the instant action pertains to the cellular telephone industry and the [CPUC's] regulatory authority ... whereas *Keogh* and *Square D* dealt with the ICC's regulatory authority").[4]

Throughout its discussion of the filed rate doctrine, the *Cellular Plus* court emphasized the absence of "any California decision similar to *Keogh* " because *Cellular Plus* did not concern the preclusive effect of *federally filed* rates. *See id.* The rates in the instant case received two levels of extensive federal review, and that federal review gives rise to application of the filed rate doctrine. Moreover, the challenge in *Cellular Plus* was to the retail prices filed in California, over which CPUC had authority; in the instant case, plaintiffs challenge the wholesale price paid in Canada, a price reviewed by ERA, filed with FERC, and not subject to question by CPUC. *See, e.g., Nantahala,* 476 U.S. at 966, 106 S.Ct. at 2357 ("a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unrea-

---

4.  The *Cellular Plus* court gave a litany of reasons for its decision not to follow *Keogh* and *Square D, see* 14 Cal.App.4th at 1242, 18 Cal.Rptr.2d 308, and though several of those reasons make clear that *Cellular Plus* is readily distinguishable from the instant case, the most salient reason is the total absence of federal review.

sonable"). We conclude that *Cellular Plus* simply has no relevance here.

## CONCLUSION

We AFFIRM the district court's dismissal of all of plaintiffs-appellants' claims on the ground that the filed rate doctrine bars such antitrust challenges to federally reviewed and filed rates.[5]

---

5. In light of our determination that the filed rate doctrine bars all of plaintiffs' claims, we need not reach the merits of the other defenses that defendants have raised.